[No. D043320. Fourth Dist., Div. One. Feb. 19, 2004.]

ALICIA B., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Real Party in Interest.

858

## COUNSEL

Timothy A. Chandler, Alternate Public Defender, James J. McMahon and Enriqueta Rico, Deputy Alternate Public Defenders, for Petitioner.

No appearance for Respondent.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Janice J. Casillas, Deputy County Counsel, for Real Party in Interest.

## OPINION

**AARON, J.**—The San Diego County Health and Human Services Agency (HHSA) took newborn Christopher K. into protective custody after his mother, Alicia B., admitted she used methamphetamine in the week before delivery and he tested positive for alcohol. The juvenile court denied reunification services and set a permanent planning hearing.

Alicia seeks writ review. (Welf. & Inst. Code § 366.26, subd. (*l*); Cal. Rules of Court, rule 39.1B.)[1] She claims the court erred by not placing Christopher with Susan S., his maternal grandmother, and by finding the Indian Child Welfare Act of 1978 (the ICWA) (25 U.S.C. § 1901 et seq.) did not apply. We issued an order to show cause, HHSA responded, and the parties waived oral argument. We review the petition on the merits and deny it.

### PROCEDURAL AND FACTUAL BACKGROUND

In July 2003 Alicia gave birth to Christopher, her sixth child.[2] She admitted methamphetamine use the week before and the day before delivery.

---

[1] All statutory references are to the Welfare and Institutions Code and all rule references are to the California Rules of Court.

[2] Alicia's three oldest children became dependents of the court in 1999 on allegations of neglect. (§ 300, subd. (b).) A permanent plan of legal guardianship was selected, and the children were placed in guardianship with Susan, the maternal grandmother. Alicia gave birth

Alicia tested positive for methamphetamine, and Christopher tested positive for ethanol (alcohol).

On July 22 HHSA filed a petition on Christopher's behalf, alleging Alicia's substance abuse rendered her unable to provide regular care for him and put him at substantial risk of harm. (§ 300, subd. (b).)

Alicia told a social worker that she had Indian ancestry through her mother, who was registered with a tribe in Butte, Montana. Alicia did not have any other information about the tribe or affiliation. At the detention hearing, the court ordered HHSA to notify the Blackfeet and Cherokee tribes.

Alicia also told a social worker that she wanted Christopher placed with Susan, who also requested the placement. On August 7 HHSA initiated an evaluation of Susan for possible placement of Christopher with her. Susan was listed twice as a suspect on the state Child Abuse Index, which prompted HHSA to undertake a detailed review of its child protective services records regarding Susan. Susan had eight referrals involving her own children, one of which was substantiated.[3] Susan also had seven referrals involving her care of her grandchildren (see fn. 2, *ante*), one of which was substantiated for general neglect. In that incident, Susan's four-year-old granddaughter was in the bathtub, found a razor and attempted to shave her legs; the granddaughter cut herself and was treated at the hospital. The social worker reported that Susan did not meet the placement requirements because she had a previous substantiated case with child protective services.

On September 17 Alicia appeared with counsel at the jurisdiction hearing, which Susan also attended. The court found the Indian tribes had been given appropriate notice of the proceedings and that the ICWA did not apply.[4] Alicia asked for a trial.

On October 6 Susan telephoned the social worker and left a voice mail message, stating she was going to end her efforts to have Christopher placed

to twin boys, who were removed from her custody on allegations of abuse or neglect of a sibling. (§ 300, subd. (j).) After six months of services, Alicia's parental rights were terminated and the twins were later adopted.

[3] In 1979 a petition was filed on behalf of Alicia, then two years old, and her three-month-old brother, alleging medical neglect.

[4] In her report for the jurisdiction hearing, the social worker informed the court she had sent notices by certified mail to the Blackfeet Tribe, the Eastern Band of Cherokee Tribe, the United Keetoowah Band of Cherokee Tribe, the Cherokee Nation of Oklahoma, and the Bureau of Indian Affairs (BIA). The social worker received responses from the Blackfeet Tribe and the Eastern Band of Cherokee Tribe that Christopher was not an Indian child under the ICWA. She received no response from the other two tribes or from the BIA. Attached to the social worker's report were copies of the proofs of certified mail and return receipts for the four tribes noticed and the BIA, and the responses from the two tribes that responded.

with her. A transcript of the message read in part: "This is the hardest thing I've ever had to do, I really wanted this baby but I think you were right, the best thing for him would be to go with the family that adopted the twins."

The contested jurisdictional/dispositional hearing took place on November 25. After the court made a true finding on Christopher's petition, the court took judicial notice of the findings and orders in the dependency case files of his siblings. Social worker Carmen Gibson testified that Susan was not an appropriate placement because of her child protective services history with her own children and the substantiated referral regarding the shaving incident. Gibson considered Susan's voice mail message on October 6 in forming her opinion. Gibson did not receive any other communications from Susan about Christopher's placement after October 6. Gibson already had decided to recommend against placing Christopher with Susan before she received the October 6 message.

In her testimony, Susan acknowledged her October 6 voice mail message, but said she now wanted Christopher to be placed with her. Susan said that sometime after October 6 she left the social worker a message requesting that Christopher be placed with her. Susan testified she left the October 6 voice mail message because an HHSA supervisor had told her that if she continued with her efforts to have Christopher placed with her, HHSA would remove her other three grandchildren from her home. Susan explained she had received a telephone call from a female supervisor about two days before October 6, but she did not know the supervisor's name.[5] Susan felt threatened by the supervisor's call.

Susan also testified about the shaving incident involving her granddaughter, explaining that she had just moved that day and that her granddaughter found a razor on the bathroom windowsill. Susan had not seen the razor on the windowsill. When she discovered that her granddaughter had injured herself, Susan immediately telephoned the social worker and took her granddaughter to the emergency room.

Susan spent $900 purchasing items for a nursery for Christopher.

In rebuttal, social worker Gibson testified she never threatened Susan about anything in this case and specifically, that she never telephoned Susan, her mother or Alicia threatening to remove the guardianship children. Gibson had no knowledge that her supervisor, Michael Weinrick, or any other HHSA supervisor, had contacted Susan about Christopher's placement. To have

---

[5] Susan's mother, Barbara U., with whom Susan lived, testified she heard part of the conversation with the HHSA supervisor on a speaker telephone.

Christopher placed with Susan would have required the approval of a section chief because of Susan's substantiated referral. Gibson did not request such a waiver because a request would indicate that she favored placing Christopher with Susan and believed it would be a good placement. Gibson did not believe this would be a good placement for Christopher.

The court declared Christopher a dependent, removed him from parental custody, placed him in licensed out-of-home care, ordered that no reunification services be provided to Alicia pursuant to section 361.5, subdivision (b)(10), and set a section 366.26 hearing. In choosing not to place Christopher with Susan, the court noted it was disturbing that Susan had not visited Christopher for more than two months, and it was in Christopher's best interests to remain in his current placement, a "safe place" where he had been for four months. The court also did not believe that Susan had received a threatening telephone call from an HHSA supervisor.

## DISCUSSION

### I. *Placement of Christopher*

Alicia contends the court erred by not placing Christopher with Susan. The contention is without merit.

■ When a child is removed from his or her parents' custody under section 361, the juvenile court places the care, custody, control, and conduct of the child under the social worker's supervision. (§ 361.2, subd. (e).) The social worker may place the child in several locations, including the approved home of a relative. (§ 361.2, subd. (e)(1)–(8).) Relatives who request placement of a dependent child are given preferential consideration. (§ 361.3, subd. (a).) In determining whether to place the child with the requesting relative, the court and social worker consider the factors enumerated in section 361.3, subdivision (a).[6] The linchpin of a section 361.3 analysis is

---

[6] Those factors are: "(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] (3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement. [¶] (4) Placement of siblings and half-siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002. [¶] (5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect. [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for the child. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E)

whether placement with a relative is in the best interests of the minor. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 321 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

We review a juvenile court's custody placement orders under the abuse of discretion standard of review; the court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse. (*In re Luke L.* (1996) 44 Cal.App.4th 670, 680 [52 Cal.Rptr.2d 53]; *In re Sarah S.* (1996) 43 Cal.App.4th 274, 286 [50 Cal.Rptr.2d 503]; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 [24 Cal.Rptr.2d 654].) "Broad deference must be shown to the trial judge. The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." [Citations.]' [Citation.]" (*In re Robert L., supra,* 21 Cal.App.4th at p. 1067.)

As Christopher's grandmother, Susan was eligible for preferential consideration as a relative placement under section 361.3. However, preferential consideration under section 361.3 "does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests." (*In re Sarah S., supra,* 43 Cal.App.4th at p. 286.) In other words, when a child is taken from his parents' care and requires placement outside the home, section 361.3 assures an interested relative that his or her application for placement will be considered before a stranger's request. (*In re Sarah S.,* at p. 285; see also § 361.3, subd. (c), which states: "For purposes of this section . . . [¶] . . .'[p]referential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated.")

The issue for the juvenile court in this case was whether, considering the suitability of Susan's home and the best interests of Christopher, placement with Susan was appropriate. (§ 361.3, subd. (a); *In re Stephanie M., supra,* 7 Cal.4th at p. 321.) The record shows that HHSA evaluated Susan in a timely manner and provided the results of its investigation to the court. In reaching its decision, the court properly stated its reasons for denying placement of Christopher with Susan. (§ 366.3, subd. (e).)

From our review of the record, we conclude that the juvenile court's decision denying placement of Christopher with Susan was well within its

---

Facilitate court-ordered reunification efforts with the parents. [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H) Provide legal permanence for the child if reunification fails. [¶] . . . [¶] (I) Arrange for appropriate and safe child care, as necessary. [¶] (8) The safety of the relative's home . . . ." (§ 361.3, subd. (a).)

discretion. In evaluating Susan, HHSA discovered she had a history with child protective services, including a substantiated referral of neglect with another grandchild in her care. When determining whether placement with a relative is appropriate, the social worker and the court must consider whether the relative has a history of child abuse or neglect. (§ 361.3, subd. (a)(5).) Moreover, the court was concerned with Susan's failure to visit Christopher for two months. In the meantime, Christopher was doing well in a "safe place."

The court also considered Susan's voice mail message stating she no longer wanted to be considered and her later decision to again seek placement. The court did not believe Susan's explanation that she had received a threatening call from an HHSA supervisor. Our job is not to reweigh the evidence. The juvenile court, sitting as trier of fact, heard the witnesses testifying and was in a better position than we are to adjudge their testimony.

■ Balancing the benefits of maintaining extended family relationships against the best interests of the child is a critical element in the placement decision. (§ 361.3, subd. (a)(1)–(8).) With the evidence discussed above before the court, it is not surprising the juvenile court concluded Susan's home was not suitable for Christopher. We realize the importance of according relatives a "fair chance" to obtain custody. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033 [111 Cal.Rptr.2d 243].) At the same time, however, the fundamental duty of the juvenile court is to "assure the best interest of the child . . . ." (*In re Stephanie M., supra*, 7 Cal.4th at p. 321.) We conclude that the court properly rejected placement of Christopher with Susan. There was no abuse of discretion.

## II.  *Notices Under the Indian Child Welfare Act*

Alicia contends the court committed prejudicial error by finding the ICWA did not apply because HHSA had not submitted enough information to show the Indian tribes were properly noticed. We conclude the proper procedures were not followed, but that there was no prejudice.

In 1978 Congress enacted the ICWA "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster care or adoptive homes which will reflect the unique values of Indian culture." (25 U.S.C. § 1902.)

"The ICWA confers on tribes the right to intervene at any point in state court dependency proceedings. . . . 'Of course, the tribe's right to assert

jurisdiction over the proceeding or to intervene in it is meaningless if the tribe has no notice that the action is pending.' " (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 253 [126 Cal.Rptr.2d 639], citations omitted.) The ICWA sets forth specific notice requirements in title 25 United States Code section 1912(a), which provides in part:

"In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe . . . ."

The BIA acts as the agent for the Secretary of the Interior. (*Dwayne P.*, *supra*, 103 Cal.App.4th at p. 253.)

The Indian tribe determines whether the child is an Indian child. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 470 [99 Cal.Rptr.2d 688].) "A tribe's determination that the child is or is not a member of or eligible for membership in the tribe is conclusive." (Rule 1439(g)(1).)

The notice sent to the BIA and/or Indian tribes must contain enough information to be meaningful. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 175 [6 Cal.Rptr.3d 205].) To enable a court to review whether sufficient information was supplied, HHSA must file with the court the ICWA notice, return receipts, and responses received from the BIA and tribes. (*Id.* at pp. 175, 178–179.)

Alicia is correct that HHSA did not file with the juvenile court the notices it sent to the four tribes and the BIA. (See fn. 4, *ante*.) This was error. To resolve whether the tribes and/or the BIA were supplied with all known relevant information, the court must review the actual notices sent by HHSA. (*In re Karla C.*, *supra*, 113 Cal.App.4th at p. 178.)

However, HHSA, concurrent with the filing of its response to the petition, moved to augment the record on appeal to include, among other things, copies of the state-approved notices it sent to the four tribes and the BIA in

August 2003.[7] (Rules 12 (a)(1)(A), 12(a)(2), 39.2A (d).) Alicia filed timely opposition to the request to augment, relying principally on *In re Zeth S.* (2003) 31 Cal.4th 396, 400 [2 Cal.Rptr.3d 683, 73 P.3d 541], which held a reviewing court generally may not "receive and consider postjudgment evidence that was never before the juvenile court, and rely on such evidence outside the record on appeal to reverse" a judgment terminating parental rights.

First, we note that *Zeth S.* did not bar postjudgment evidence; it indicated an appellate court could consider such evidence in extraordinary circumstances. (*In re Zeth S., supra,* 31 Cal.4th at p. 400.)

Second, we find Alicia's reliance on *Zeth S.* is misplaced. *Zeth S.* was an appeal of a judgment terminating parental rights, which challenged the juvenile court's finding that the beneficial relationship exception to adoption (§ 366.26, subd. (c)(1)(A)) did not apply. (*In re Zeth S., supra,* 31 Cal.4th at p. 403.) Appellate counsel sought to augment the record on appeal with postjudgment evidence that the parent was currently interacting with the child, and that the relative caretaker had felt pressured by the social services agency to agree to adopt. (*Id.* at pp. 403–404.)[8] The Supreme Court was concerned that the Court of Appeal had taken what was essentially a substantial evidence issue and used new evidence to revisit the "mother-child relationship . . . a settled matter which, by statutory directive, could not be reopened for reconsideration by mother . . . ." (*Id.* at pp. 411–412.) The statutory scheme for juvenile dependency cases "does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard . . . This is particularly true where . . . [the postjudgment] evidence, in likelihood, would have been irrelevant and excludable had it been known and presented to the trial court in the first instance." (*Id.* at p. 410.)

Here, Alicia is not appealing the termination of her parental rights; rather this is a rule 39.1B writ proceeding in which she is raising an ICWA notice issue, which can be raised at any time. (*Dwayne P. v. Superior Court, supra,* 103 Cal.App.4th at p. 260.) Moreover, unlike the postjudgment evidence at issue in *In re Zeth S., supra,* 31 Cal.4th 396, HHSA does not seek to augment

---

[7] The notices are (1) Request for Confirmation of Child's Status as Indian, and (2) Notice of Involuntary Child Custody Proceeding Involving an Indian Child. These forms are numbered "SOC 318" and "SOC 319" and are promulgated by the State of California Health and Welfare Agency for the benefit of county agencies and are intended to conform with the Guidelines for State Courts; Indian Child Custody Proceedings (44 Fed.Reg. 67584 (Nov. 26, 1979)). (*In re Karla C., supra,* 113 Cal.App.4th at p. 176.)

[8] In *In re Zeth S., supra,* 31 Cal.4th at page 404, the child's trial counsel joined the agency's position favoring termination of parental rights, but the child's appellate counsel sided with the parent after investigating the child's current circumstances.

the appellate record with *new* materials or evidence. The notices at issue were sent to the tribes and the BIA in August 2003, which was *before* the court ruled that the ICWA did not apply. HHSA's motion to augment the record contains postjudgment evidence only in the sense that the ICWA notices were filed in the superior court during the pendency of this writ procedure. The ICWA notices themselves were not new. Further, the ICWA notices are relevant and would have been admissible if they had been timely presented below.

Finally, denying HHSA's motion to augment would be counterproductive to "the state's strong interest in the expeditiousness and finality of juvenile court dependency proceedings." (*In re Zeth S.*, *supra*, 31 Cal.4th at p. 412.) Accordingly, we grant HHSA's motion to augment the record on appeal.

■ The augmented record shows that HHSA timely sent proper notice to the four tribes and the BIA on state-approved forms. (See fn. 7, *ante.*) Alicia has not shown that any relevant known information was excluded on the forms or that the notices were defective. HHSA's error in not timely filing copies of the notices with the court was therefore harmless. The juvenile court's finding that the ICWA did not apply was premature, but it was not prejudicial.

## DISPOSITION

The petition is denied.

Benke, Acting P. J., and Irion, J., concurred.