Filed 4/21/15  In re T.S. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re T.S. et al., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,  Plaintiff and Respondent,  v.  Jose S.,  Defendant and Appellant. | A142503  (San Mateo County Super. Ct. No. 83471) |

Wendy S. and Jose S. had a relationship that ended acrimoniously in 2010 after they had two children, T.S. and N.S.  The two parents made numerous allegations of neglect and abuse against each other.  Concerned for the children, the San Mateo County Human Services Agency (agency) entered into a voluntary services case plan with Wendy, who had physical custody of the children.  When Wendy refused to extend the plan, despite the children witnessing frequent discord between their parents and between Wendy and her parents, the agency filed a Welfare and Institutions Code section 300, subdivision (b),[1] dependency petition.

---

[1] Unless indicated otherwise, further statutory citations are to the Welfare and Institutions Code.

Although the agency did not recommend removal of the children from Wendy's home, the juvenile court detained the children with Wendy's parents, Diane S. and Jerry S. (the grandparents). It was six months before a contested disposition hearing could be held. In the meantime, the court ordered that the children be detained with Jose rather than with the grandparents, but soon thereafter Jose was detained for deportation proceedings and the children were returned to the grandparents.

Jose was released on a six-month stay of deportation. At the disposition hearing, the court ordered placement of the children with Wendy, under continued supervision by the agency. Jose appeals from that order, contending that there was clear and convincing evidence the children were at substantial risk of harm in Wendy's care and that the court abused its discretion by improperly considering the deportation proceedings against him in making its order. We disagree and affirm.

## BACKGROUND

On December 18, 2013, the agency filed juvenile dependency petitions pursuant to section 300, subdivision (b), on behalf of T.S. (then nine years old) and N.S. (then three years old). Under a family court order, Wendy and Jose share legal custody of the children, Wendy has full physical custody, and Jose has overnight visitation from noon on Sunday to 4:00 p.m. on Tuesday. Interaction between Jose and Wendy was contentious and the parents made competing allegations of neglect and abuse.[2] When the agency filed the petitions, Wendy had a restraining order against Jose. Wendy also had a contentious relationship with her parents, Diane and Jerry, with whom the children frequently stayed overnight. Diane obtained a restraining order against Wendy after a physical altercation.

On April 24, 2013, Wendy lost her temper with T.S. and grazed her teeth against his cheek, leaving red marks. On April 28, 2013, T.S. witnessed the physical altercation

---

[2] Between January 10, 2012, and September 29, 2013, the agency received 11 reports of abuse or neglect by one or the other parent, all of which were "evaluated out" or determined to be unfounded (or, in two cases, inconclusive). The police were called many times due to allegations by the parents against each other.

between Wendy and Diane. The department devised a safety plan and Wendy agreed to refrain from physical discipline and to monitor the children more closely. Wendy also agreed to and signed a voluntary services case plan that included goals of family and individual therapy, parenting education and regular school attendance by the children. Nevertheless, the children continued to witness conflict between Wendy and Jose and between Wendy and her parents.[3]

The agency became concerned regarding Wendy's ability to emotionally support the children. On one occasion, Wendy came to the social worker's office "stating in front of the crying children that she was done with the children and no longer wanted to care for the children as they continue to be disrespectful and that they could go and live with the father and that she had it with them."

On November 12, 2013, the social worker met with Wendy to discuss extending the case plan to address concerns and provide services. Wendy refused. The agency filed the dependency petitions because, despite six months of voluntary services, "the same issues with the family remain and only have intensified. The children continue to be in need of therapy services and the mother's mental health issues continue to need to be addressed."

T.S.'s petition alleged that Wendy had left red marks on his cheek with her teeth, that Wendy had a fight with Diane in T.S.'s presence, that Wendy continued to expose him to ongoing conflicts with Jose and Diane, and that the escalating family conflict and Wendy's failure to renew a voluntary services plan placed T.S. at risk of harm. N.S.'s petition alleged that he had been exposed to family conflict and violence, that he had been engaging in aggressive behavior since May 2013, and that Wendy had refused to renew the voluntary services plan, interrupting N.S.'s individual therapy.

The agency filed a detention report on December 18, 2013. The report recommended court intervention "to ensure the children's safety and well being" and to

---

[3] On June 30, 2013, during an exchange of the children, Wendy and Jose engaged in a verbal and physical altercation in front of the children and Jose was arrested.

3

ensure "that the needed services are mandated and monitored." The agency did not recommend that the children be detained from Wendy's home. Nevertheless, on December 26, 2013, the juvenile court ordered the children detained with the grandparents pending jurisdiction and disposition hearings, with supervised visits for Wendy and no change to Jose's Sunday-to-Tuesday visitation schedule. The court believed that the children were at risk of emotional harm if they remained with Wendy. The court did not detain the children in Jose's home because it believed "there might be some parental alienation going on, if they are only to be in the home of the father."

The agency filed an initial jurisdiction/disposition report on January 14, 2014.

T.S. told the social worker, David Marquez, that Wendy sometimes hit him and N.S. with a belt, but not hard enough to hurt. He reported that his parents did not get along and had fought one another. He had seen Jose spit on Wendy and punch her in the face, leaving a mark on her mouth.

The grandparents told Marquez that the children were "stuck in the middle of [the parents'] arguments." Diane didn't believe that Wendy had a drug problem, but said that Wendy had been diagnosed with ADHD and had "changed" after meeting her current boyfriend. Jerry explained that Wendy could not handle the boys' aggressive behavior. As a result, Wendy would often call and ask them to take the boys.

Marquez noted that although Wendy had spoken with numerous service providers, she failed to follow through and lacked insight into how her behaviors affect the children. His observation was that Wendy tries to be patient with the children, but often loses her temper and reacts negatively. Although Wendy's visits with the children were sometimes interactive and happy, at other times they became problematic when Wendy became frustrated with the children, especially T.S.

Marquez also reported that Jose easily loses his temper and lacks insight about how the children are affected by his verbal abuse of Wendy and the parents' physical altercations in their presence. Jose also seemed hesitant to engage with the services provided for the children and did not want any appointments scheduled during his time with them. Marquez later noted that Jose was reluctant to allow him to meet with him at

4

his home to observe his interactions with the children. However, when Marquez did visit and was able to observe Jose with N.S. (T.S. was at school), N.S. appeared comfortable there and was affectionate with Jose.

Both children stated their desire to remain in the grandparents' home, but they also wanted to see Wendy more often. Diane believed that T.S. was adjusting well to living with them, but thought N.S. was having a hard time " 'especially after coming back from their father's.' " She said that N.S. acted aggressively, cursed, and called them names, but calmed down a couple of days after returning from Jose's home.

The agency's initial report recommended that the children be adjudged dependents of the court, that they be removed from Wendy's home and placed in the home of the grandparents, that Wendy and Jose receive services under case plans, that Wendy have two supervised visits a week, and that father continue to have unsupervised, overnight visits three times per week.

As time passed, the agency developed concerns about the home environment provided by the grandparents. The third addendum report, filed on February 21, 2014, noted "language and cursing" in the home and threats used as a form of discipline. The children reported that their grandparents spoke negatively about both Wendy and Jose to them. Accordingly, the agency changed its recommendation to placement with Jose while services were provided to the family.

On February 24, 2014, the juvenile court made interim orders "in the format as recommended in the third addendum to the report." The children were placed with Jose pending the jurisdiction/disposition hearing. Wendy was to have a minimum of two visits per week. Continued contact with the grandparents, but not overnight contact, was encouraged. In March 2014, both T.S. and N.S. stated "that things were 'fine' " in Jose's home.

By the time the fourth addendum report was filed on March 6, 2014, the children were participating in therapeutic supervised visitation with the mother. The visits were facilitated by psychiatric social worker Nicole Daly, who reported that Wendy was "great" at assessing N.S.'s needs and handled N.S.'s acting out behavior "very well."

5

While the visits demonstrated that there were " 'issues' " between Wendy and T.S., visitation between them had generally gone well. Daly reported that Wendy "has struggled with managing her anger regarding issues related to concerns about other adult caregivers in the children's lives" and "lacks self-regulation when discussing court issues and frustration with her perception of [the agency's] lack of support to her family." Wendy acknowledged to Daly that she and T.S. could benefit from therapeutic support to help them improve their communication. Marquez observed that when Wendy "is calm, she can be very loving and affectionate with her children. She can be insightful and aware of her children's needs, but when she cannot control her frustration, she becomes angry very quickly and it is difficult to calm her down."

The jurisdiction/disposition hearing set for March 10, 2014, was continued because Jose was unavailable due to immigration issues. Jose's counsel indicated that the children were staying with the grandparents pending the next hearing.

On April 3, 2014, the agency filed a fifth addendum report. Daly reported that Wendy "is doing great in the visits with the children." Marquez had contacted Homeland Security and learned that Jose was on an immigration hold and that deportation proceedings were in progress. The grandparents had complained to the agency about the children's service providers, but Diane refused to talk with Marquez when he attempted to contact her, and Jerry stated that they were upset at the agency for recommending that the children be placed with the father rather than remaining with them. Further meetings between Diane, Jerry, Marquez and service providers demonstrated that obtaining the grandparents' cooperation with the agency and service providers would be problematic. The agency changed its disposition recommendation to one of foster care for the children "[g]iven the toxicity of the children's current placement." The report explained: "The four adults involved as primary care givers for these children seem to be more interested in controlling the other parties than they are in ensuring the children's health, emotional health, and well being."

At an interim hearing on April 7, 2014, the court declined to place the children in foster care but warned the grandparents that the court would have no option but to change

6

the children's placement if they did not cooperate with the service providers. The court granted the agency discretion regarding additional visits with Wendy and directed the grandparents to cooperate.

On May 5, 2014, the agency filed a sixth addendum report. Jose was still detained in immigration proceedings. The grandparents had become "more flexible and cooperative" with the agency, but services providers had reported instances in which Diane spoke negatively about Wendy in front of the children. Daly reported that Wendy " 'engages in nurturing activities with both boys,' " has " 'demonstrated different parent techniques to help de-escalate the boys, redirect undesirable behavior, and to enhance their communication with herself and with each other' " and has been able to " 'decrease her communication to her boys during visits about other adult family caregivers.' " Wendy had participated in a team decision-making meeting with the agency to discuss what was required of her to reunify with the children and to develop an action plan. At the meeting, Wendy "was open about her concerns regarding her children, had thought out ideas as to how to alleviate problems that have arisen, and was open to hearing about areas in which she can improve."

On May 6, 2014, the agency filed a seventh addendum report. Jose had been released from custody and was back at his home. Homeland Security Officer Alvin Wong reported that he was " 'on temporar[y] leave to attend the upcoming [Juvenile] Court hearings.' " Wong explained that Jose was required " 'to obtain a passport, not violate any local, state, or federal laws, and report to his probation officer, if he has one.' " In addition, Jose was required to " 'check in with [Homeland Security] once a month and if he violates any of the terms, he will be deported.' "

Marquez had asked T.S. and N.S. about where they preferred to live. T.S. said that he does not like his father's home and that his order of preference was first with his

7

grandparents, then with Wendy, and finally with Jose.[4] N.S.'s order of preference was first with Wendy, then with his grandparents, and finally with Jose.

At an interim hearing on May 7, 2014, Jose's counsel presented a copy of a stay of deportation signed on April 30, 2014. Counsel stated "It is for six months. It is my understanding that it is renewable." The court ordered "the parties to cooperate to set up a workable visitation schedule for [Jose] that doesn't interfere with Mother's current visitation schedule or the other counseling sessions that the children are participating in or any other beneficial activity that the children are engaged in at this point in time."

On June 11, 2014, the agency filed an eighth and final addendum report. The children agreed with Marquez that visits with Wendy were "going much smoother." N.S. reported that he wanted to return to living with his mother and the grandparents would be his second choice. T.S. preferred to remain living with his grandparents. It was now the agency's recommendation that the court sustain the petitions and declare T.S. and N.S. dependents of the court; that the children return to Wendy's home "[g]iven the progress [Wendy] has made over the past several months," that Jose have visitation with the children, and that the family participate in family maintenance services.

On June 16, 2014, the agency filed amended dependency petitions in which the wording of the allegations was modified slightly.[5] At the hearing that day, both parents submitted on the matter of jurisdiction. The court found by a preponderance of the evidence that the allegations were true and declared the children to be dependents of the court. The court then conducted a contested disposition hearing.

Marquez testified that although the agency had concerns about returning the children to Wendy's home, "we have services in place such as in-home counseling. Both children have their own therapist." He believed that with Daly's help Wendy had found

---

[4] T.S. expressed his preference in terms of people, not in terms of homes. His actual order was Jerry, Wendy, Diane and then Jose.

[5] The amended petition for T.S. alleged that Wendy's teeth had left a "small red mark" on his cheek rather than "red marks" as well as other minor changes in wording. The amended petition for N.S. removed allegations that Wendy instigated the family conflicts and failed to recognize N.S.'s need for therapeutic services.

8

ways to handle T.S.'s behaviors. He explained that "followthrough with services has been or was a major issue in the past," but he believed "that has been alleviated" because Wendy "has been participating in services frequently and often." The children had regularly attended their individual therapy sessions and the therapists reported they had made progress. Marquez reiterated that the agency did not recommend a disposition of removal from Wendy's home. He believed that both T.S. and N.S. had suffered as a result of the temporary removal pending jurisdiction and disposition.

Daly testified that the initial goal of the therapeutic visitation services she provided for Wendy and the children was for Wendy "to not engage with the children about discussion about . . . adult family members. And [Wendy] has absolutely met that goal." The current goal was "to work . . . on deescalating power struggles between her and specifically [T.S.] and how to remain calm in her communications with her children." That goal was still in progress but Wendy had made "great progress[]" toward meeting it. Daly had observed Wendy implement strategies in dealing with the children after discussing them with her. Despite power struggles between Wendy and T.S., Daly had "seen a lot of bonding and positive things as well" She believed that being out of his mother's care had been "extremely hard" for N.S. and "difficult for [T.S.], as well; but I think he's responded in different ways."

T.S. testified that if he couldn't live with his grandparents, he would prefer to live with his mother. He testified that Wendy had "changed" and was talking to him ("using her words") rather than yelling. He believed that she was acting in a "better way."

The juvenile court followed the recommendations of the agency and ordered an in-home placement with Wendy, subject to agency supervision, with a transition plan for the children to be moved from the grandparents' home. The court ordered that Wendy would be subject to unannounced visits by the agency. It declared Jose to be the presumed father and reinstated his prior visitation schedule from noon Sunday to 4:00 p.m. Tuesday. The court also ordered services as recommended by the agency, including intensive in-home counseling and wrap around services.

On June 25, 2014, Jose timely filed a notice of appeal.

9

## DISCUSSION

In this case, Wendy was the parent who had physical custody of T.S. and N.S. at the time dependency proceedings were initiated. On the facts of this case, the juvenile court could order a disposition removing the children from Wendy's home only by finding clear and convincing evidence of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home." (§ 361, subd. (c)(1).) If the court had made such a finding, it would have been required to place the children with Jose, unless it also found that placement with him "would be detrimental to the safety, protection, or physical or emotional well-being" of the children. (§ 361.2, subd. (a).) When a child is placed with a noncustodial parent, that placement is made without regard "to the parent's immigration status." (§ 361.2, subd. (e)(1).)[6]

"We review a juvenile court's custody placement orders under the abuse of discretion standard of review; the court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse. (*Alicia B. v. Superior Court of San Diego County* (2004) 116 Cal.App.4th 856, 863.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272.)

Jose contends that the court abused its discretion because in his estimation there was clear and convincing evidence of substantial danger of physical and emotional harm to the children if they remained in Wendy's home and the court improperly considered his immigration status when it returned the children to her care under the supervision of the agency. He argues that "the only reasoning the court gave for following the Agency's recommendation . . . was in reliance on [Jose's] 'immigration situation.' " We disagree.

---

[6] Similarly, section 361.3, subdivision (a), provides in relevant part: "In any case in which is child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status."

10

In reaching its detention orders, the court stated: "So I just want to say for the record that I have read and considered the trial briefs that were in the file, including [Jose's counsel's] brief. I have given serious thought to everyone's arguments; and certainly, I think everyone is trying to do what they think is best for the children and I understand that.

"And I understand that the only reason that we're here is because of the mother's initial refusal to accept voluntary services so I do understand that that's where we started.

"And at that time, there was physical custody by the mother of both children with the father having visitation from Sunday through Tuesday. So I understand that that's where we started.

"And I understand the Department's recommendation—and unfortunately, as these things happen when it all evolves, then there are all other kinds of considerations that come into play. So I think that it's clear that everyone involved loves the children. Unfortunately, they can't get along with each other and that's the dynamic that we're pretty much stuck with."

The court continued: "And I also appreciate that the father—while it's clear that the father loves his children and would like to have custody of both boys all the time—I do have a lot of concerns about the—well, first of all, he didn't have custody initially when this started; this process started. We'll start there.

"And secondly, I do have some concerns about the immigration situation as testified to.

"The Court is going to follow the recommendation of the Department . . . ."

Contrary to Jose's argument, this does not give us the impression that if Jose had no immigration issues, the court would have found clear and convincing evidence of a serious risk of harm to the children if placed in Wendy's home. The court was clearly concerned about Jose's immigration situation and the future impact that might have on the children, but the court's preliminary remarks provide no reason to believe that the court's disposition of in-home placement with Wendy was based on that concern.

11

During the time the children were temporarily detained with the grandparents (and briefly with Jose), Wendy had regularly participated and made substantial progress in the recommended services and in her therapeutic visits. Daly especially was positive in her assessment of the progress that Wendy was making. Wendy had ceased talking with the children about other adult family members and had improved in her ability to deal with the children's behavior that had previously caused her frustration. The change in Wendy was apparent not only to Daly and the agency, but also to T.S., who testified that instead of yelling at him when she became upset, Wendy would now talk to him about the situation. Based on the evidence in the record, it was reasonable for the juvenile court to determine that, under agency supervision and subject to unannounced agency visits to Wendy's home, the children would not be at substantial risk of physical or emotional harm if placed with Wendy.

Father relies on *In re Jonathan P.* (2014) 226 Cal.App.4th 1240 (*Jonathan P.*), but that was a very different case. Prior to dependency proceedings, Jonathan P.'s father had physical custody and the mother had visitation. (*Id.* at p. 1245.) The father was deported, after which Jonathan P. remained in his mother's care. (*Ibid.*) When the court held a jurisdiction/disposition hearing, the father's whereabouts were unknown. (*Ibid.*) The court removed Jonathan P. from his mother's care and ordered reunification services for her. (*Ibid.*) The father reentered the United States illegally and appeared at the six-month review hearing. (*Id.* at pp. 1246-1247.) Father requested that Jonathan P. be placed with him based on the prior custody arrangement. (*Id.* at p. 1247.) At that point Jonathan P. had left his placement and his whereabouts were unknown. (*Ibid.*) The Los Angeles County Department of Children and Family Services (department) recommended that reunification services for the mother be cancelled and made no recommendation as to the father. (*Ibid.*) The court told the father that it could not restore custody to him because Jonathan P.'s whereabouts were unknown and directed him to file a section 388 petition if he wished reunification services. (*Id.* at pp. 1247-1248.)

The department recommended that the court deny father's section 388 petition but also order an evaluation under the Interstate Compact on the Placement of Children

12

(ICPC) to assess his home so that when Jonathan P. was found, a recommendation could be made to release him to the father. (*Jonathan P.*, *supra*, 226 Cal.App.4th at p. 1249.) At the hearing "[t]he Department's counsel argued that neither prong of the section 388 test had been met because in his view, Father was a 'federal fugitive' who had entered the country illegally, and that was the 'only change' in his circumstances. The Department's counsel further argued that no ICPC could be conducted, since that would 'basically, be having the court perpetuate Father's violation of federal law being in this country by helping somebody who is currently in this country illegally with this I.C.P.C.' " (*Id.* at p. 1250.) The juvenile court denied the section 388 petition, denied reunification services to the father, and did not order an ICPC evaluation. (*Ibid.*)

The Court of Appeal reversed, concluding that Jonathan P.'s father was entitled to reunification services. (*Jonathan P.*, *supra*, 226 Cal.App.4th at pp. 1257-1260.) The appellate court also determined that "the dependency court should not have required Father to prove his entitlement to custody pursuant to section 388. Instead the court should have analyzed the request under section 361.2, subdivision (a)." (*Id.* at p. 1256.) However, the court concluded that this error was harmless because Jonathan P.'s whereabouts were unknown, so "[i]t was not possible to conduct an evaluation of whether it would be detrimental to Jonathan P. to place him with Father." (*Id.* at pp. 1256-1257.) In the course of its discussion, the court found "troubling" the department trial counsel's "repeated references to Father's immigration status during the proceedings in the dependency court. It is not clear on this record the degree to which the juvenile court was influenced by Department counsel's argument on this issue, or whether Father's legal status played any role in the court's decisionmaking process. The law is clear, however, that Father's citizenship status is not a legally relevant consideration in these matters. [Citation.] It is also clear that the Department counsel's improper comments infected the proceedings, distracting the court and parties from the relevant matters at hand, namely, Father's request for custody and/or reunification services." (*Id.* at p. 1256.)

In contrast to *Jonathan P.*, Jose's immigration status came to the attention of the court because he had been detained and held for deportation proceedings at a time when

the children had been placed in his care. Jose was released after he received a six-month stay of deportation, subject to the condition that he obtain a passport. At the disposition hearing, Jose stated that he was attempting to secure a passport from El Salvador, but was having difficulty because his family was not in possession of necessary documents. Thus, it was unclear that Jose would be able to comply with the terms of his release and avoid deportation. The deportation proceedings against Jose had already deprived the children of the care that the court, at an earlier point in time, determined was in their best interest, and they had the potential of permanently depriving the children of his physical presence in their lives, to their detriment whatever the dispositional orders of the court. Under these circumstances, it was entirely proper for the court to have "concerns" about Jose's "immigration situation."

The primary question for the juvenile court in this case was whether there was substantial risk of harm to the children if they were placed with Wendy. Jose's deportation proceeding would have no relevance to that question, and the record provides no reason to believe that the court improperly considered it in evaluating the risk of harm. The court's implicit finding that there was not a substantial risk of harm was reasonable considering the progress that Wendy had made and continued supervision of the family by the agency. Because the court placed the children in Wendy's care, it never reached the question, pursuant to section 361.2, whether the children should be placed with the noncustodial parent—a question for which it would be improper to consider immigration status. Accordingly, we find no abuse of discretion by the juvenile court.

## DISPOSITION

The dispositional orders of the juvenile court are affirmed.

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
RICHMAN, J.