Filed 10/7/24  In re A.L. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D083945 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. NJ15947) |
| A.L., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Nadia J. Keilani, Judge.  Affirmed.

Marisa L. Dersey Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

Ar.L. (Father) appeals from the juvenile court's order placing daughter A.L. (Child) with her maternal relatives in Ventura County rather than her paternal relatives in San Diego County. Father asserts the placement effectively deprives him of the opportunity to reunify with Child because the distance prevents sufficient visitation.

As explained below, we conclude the juvenile court did not abuse its discretion in placing Child with her maternal family at the recommendation of both the San Diego County Health and Human Services Agency (Agency) and Child's counsel. The juvenile court reasonably concluded placement with the maternal family was in Child's best interest because she shared a deeper and longer relationship with them, she had been successful in the placement for three months since the onset of the case, and she would experience trauma if removed from the placement. Therefore, we affirm the court's order placing Child with the maternal relatives.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Initial Agency Contact*

The Agency had initial contact with Father and G.C. (Mother) in July 2023 after receiving a report that they had been smoking fentanyl in close proximity to the five-year-old Child. Indeed, after the report, Child tested positive for fentanyl. Child told an Agency protective services worker (PSW) that she had seen Father "smok[e] with foil and he put white stuff on it and he grabs a straw and he burns it and he smokes cigarettes." The parents refused to cooperate with the Agency's attempts to create a safety plan for Child. The Agency brought a petition on behalf of Child under Welfare and Institutions Code[1] section 300, subdivision (b)(1). Child's maternal grandmother, uncle, and aunt received emergency resource family approval

_____

[1]     Undesignated references are to the Welfare and Institutions Code.

2

(ERFA). However, the petition was dismissed in September 2023 because the Agency thereafter failed to locate the family.

In November 2023, police arrested Father for possession of a controlled substance and paraphernalia. Mother and Child were present, and officers completed a referral to child protective services. As a result, the Agency recommenced search efforts for the family without success.

On January 15, 2024, the family drove to the hospital, and Mother entered the emergency room complaining of respiratory distress. Mother had a severe skin infection and passed away shortly after arriving at the hospital. Hospital staff went to the parking lot to notify Father, who had remained in the car with Child. The back window of the car was broken, and the car was filthy and full of personal belongings. Child had a large infection on her chin, apparently due to moisture from sucking on a pacifier. Father permitted medical staff to perform an exam of Child, who was dirty, disheveled, emaciated, and covered with bites from a puppy and fleas. After learning that the family had obtained the puppy from a shelter in Mexico and had no vaccination records, doctors advised Father that Child needed immediate treatment for possible rabies, or she could die. Despite receiving that advice, Father told the doctors that he was going to get Child's immunization records from the car but instead left the hospital with Child. The examining doctor was extremely concerned about neglect of Child, particularly the possible exposure to rabies, and was shocked Father took Child from the hospital without treatment.

On January 18, 2024, a sheriff's deputy pulled Father's vehicle over and contacted the Agency. Child was in the vehicle; she was dirty and still had the infection on her face. The deputy discovered a loaded syringe under the driver's seat which she suspected contained heroin. Father was arrested

for causing or permitting child suffering, injury, or endangerment under Penal Code, section 273a, subdivision (a). When Father was booked into jail, he was in possession of methamphetamine and fentanyl in his rectum.

A PSW took custody of Child. Child cried "hysterically" when she had to say goodbye to Father and repeatedly asked when she would see him again. She was taken to Rady Children's Hospital, where she received treatment and tested positive for fentanyl. She had lost 10 pounds between June 2022 and January 2024. After treatment, she went to Polinsky Children's Center (PCC). There, an Agency social worker spoke with Child, who stated Father used to smoke "the white stuff with the foil, and the straw," and Father told her if she told the Agency the truth, she would be taken away from him and never see him again. Child also reported that the family had been living in the car. Child was not in school.

B. *The Petition and Detention Hearing*

On January 22, 2024, the Agency filed a juvenile dependency petition under section 300, subdivisions (b) and (g), alleging that Child faced a substantial risk of serious harm based on testing positive for fentanyl on January 18, 2024.

The following day, the court held a detention hearing and found that the Agency had stated a prima facie case for initial removal and continued detention. Father remained incarcerated. Because of the maternal family's prior ERFA and at the request of Child's counsel based on Child's wishes, Child was detained with her maternal grandmother in Ventura County, at the home she shared with the maternal aunt and uncle. The Agency had not yet evaluated the paternal relatives and additionally preferred the maternal relatives because of a concern the paternal relatives knew of the family's whereabouts when they previously evaded the Agency. Regarding placement,

4

the court noted, "But I don't want it to be that this is going to be a long term solution because ultimately it is the preference that Amber and dad be in the same county so they can have serious engagement in reunification services." Thus, the court ordered the Agency to begin assessing the paternal relatives. The court also ordered liberal supervised visitation for Father, including video visits while he was in custody.

C. *Post-petition Interviews and Events*

 1. *Child and Maternal Family*

Shortly after the placement, Child stated she liked living with her maternal family. She was doing well and felt safe in the home. Sometimes she got scared when her maternal grandmother went to the bathroom and showered because Child used to stay with Mother at all times, including during those activities. Child stated she would want to live with Father, but otherwise with her maternal grandmother.

The maternal grandmother and uncle explained that Child had been very close to Mother, but did not mention her, leading them to believe she had been coached not to say certain things. Child exhibited separation anxiety from her grandmother; she woke up and called for her maternal grandmother frequently throughout the night and was afraid if she was not there. Child expressed fear that her maternal grandmother would leave her. She feared having to return to PCC. Child had made improvements with potty training since the placement, and she was eating well. She was happy, playful, and comfortable in the home; however, she never wanted to be left alone. The maternal uncle's ultimate goal was to adopt Child, but hoped Father could turn his life around.

By the end of February 2024, Child was potty trained. Her sleeping and nourishment had substantially improved. The maternal family had

doctor and dentist appointments scheduled for Child and were working on weaning her off her pacifier. The maternal uncle planned to get Child enrolled in school quickly. She had responsibilities around the house, including helping clean and feeding her beta fish, and she also took part in walking the dog, checking the mail, baking, and crafting.

On March 26, 2024, PSW had a video call with Child. Child stated "[i]t's really good" living with her maternal uncle and grandmother. According to the maternal uncle, Child was enjoying school and had made friends.

2. *Father*

Father admitted to using fentanyl beginning late 2022 or early 2023 but stated he never did so around Child. However, he admitted that he put fentanyl in his cigarettes, which was why Child "always said he was smoking cigarettes." Previously, he had used heroin. He stated that Mother possibly smoked fentanyl with Child in the car, blaming Mother for Child testing positive for fentanyl. He explained that he could not tell Mother what to do or control what she was doing while he was at work.

However, Father admitted he and Mother had both been under the influence of fentanyl while driving with Child in the car on the day of Mother's death. Father also admitted he told the doctor he was going to the car to get Child's immunization records. He stated that the nurse told him he was allowed to leave.

Additionally, Father explained that Child was with the maternal grandmother in Ventura County now because he did not want Child to be at PCC, but he intended her to return to San Diego and be with the paternal aunt "because he needs her to be close." The maternal relatives, he felt, were too far and had health issues.

6

Father began having regular video and phone calls with Child in March 2024, which the maternal relatives facilitated.

3. *Paternal Family*

Paternal aunt Amelia, located in San Diego County, expressed concern for Child and an interest in placement. Prior to this case, she had last seen Child about two years before, and Child did not really know the paternal aunt. Paternal aunt Anais also expressed initial interest in placement. Both aunts would be willing to adopt Child if the court were to determine that was necessary. However, Anais did not continue to pursue placement through the jurisdiction and disposition hearing.

Child had regularly scheduled video and phone calls with paternal aunt Amelia. Amelia rescued Child's dog because she was upset about losing the dog. On March 8, 2024, Child visited in person with Amelia, who brought Child's dog to the visit. Amelia received ERFA clearance prior to the jurisdiction and disposition hearing.

The PSW spoke with Child after the visit with paternal aunt Amelia. Child said the visit was good, but she "doesn't know Amelia that much," just "a little," and she wanted to see paternal aunt Anais too. Child stated she wanted to live with Amelia because she had Child's dog. She stated she missed Father.

D. *The Jurisdiction and Disposition Hearing*

On April 11, 2024, the court held a contested jurisdiction and disposition hearing. The section 300, subdivision (g), allegation was stricken at the Agency's request, and the court made a true finding on the petition. At the hearing, the PSW testified that the Agency recommended placement with the maternal relatives because Child had a relationship with them, she was happy and well taken care of in the home, and it would be less traumatizing

7

for her to remain with them. The maternal relatives had seen Child throughout her life, including a brief period when Child and Mother stayed at the maternal relatives' home. While paternal aunt Amelia had been cleared for placement, Amelia had no contact with Father or Child for two years prior to the case.

Like the Agency, Child's counsel also recommended placement with the maternal family. Counsel explained that Child had not seen the paternal aunt for two years before the case and did not know her, and Child repeatedly told counsel she wished to live with the maternal family and have visits with Father and the paternal family.

The court declared Child a dependent of the court, found clear and convincing evidence to remove Child from parental custody under section 361, subdivision (c), and ordered reunification services and liberal supervised visitation for Father. The court placed Child with the maternal aunt and uncle, who lived with the maternal grandmother. The court concluded that, although paternal aunt Amelia would satisfy the section 361.3 factors, the maternal relatives had a deeper, longer, more consistent relationship with Child. Further, Child had been doing well in their care and in school for three months, and it would be traumatic to remove her from her maternal relatives, whom she knows and is accustomed to, and from whom she finds comfort. The court stated that the "best interest of the child is the lynchpin of the analysis," citing *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862–863 (*Alicia B.*).

### DISCUSSION

Father contends the court abused its discretion by placing Child in a home outside of San Diego County because it in effect eliminated any possibility of reunification. The Agency argues: (1) Father's argument as to

8

his future ability to reunify is not ripe for appellate review; (2) Father forfeited the issue by failing to raise it below; and (3) the juvenile court did not abuse its discretion by maintaining her placement with the maternal relatives because it would be least traumatizing for Child. We consider the merits of Father's appeal[2] but disagree with his conclusion that the court abused its discretion by placing Child with the maternal family out of county.

Section 361.3, subdivision (a), provides a nonexhaustive list of factors the court shall consider when multiple relatives request placement. (§ 361.3, subd. (b).) As relevant here, these factors include: "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs" (§ 361.3, subd. (a)(1)); "[t]he wishes of the parent, the relative, and child, if appropriate" (§ 361.3, subd. (a)(2)); [t]he provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement" (§ 361.3, subd. (a)(3)); "[t]he nature and duration of the relationship between the child and the relative" (§ 361.3, subd. (a)(6)); and "[t]he ability of the relative to . . . [f]acilitate court-ordered reunification efforts with the parents" (§ 361.3, subd. (a)(7)(E)).[3] Family Code section 7950, subdivision (a)(1), dictates that "[p]lacement [in foster

---

[2]    The Agency contends Father's argument that the out of county placement is contrary to the goal of reunification is not ripe for appellate review. We follow *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1422 (*Sabrina H.*) and *In re Luke L.* (1996) 44 Cal.App.4th 670, 680–681 (*Luke L.*), in considering the merits of Father's argument.

[3]    Section 361.3, subdivision (a), additionally contains other factors not relevant because both sets of relatives seeking placement satisfied the factors, such as the moral character of the relatives in the home (§ 361.3, subd. (a)(5)); the willingness to provide legal permanency if reunification fails (§ 361.3, subd. (a)(6), (a)(7)(H)(i)); and the ability to provide a proper home and care (§ 361.3, subd. (a)(7)(A), (B), (C), & (I); (8)(A)).

care] shall, if possible, be made in the home of a relative, unless the placement would not be in the best interest of the child" while giving "full consideration [to] the proximity of the natural parents to the placement so as to facilitate visitation and family reunification."

A juvenile court has "wide discretion" in making placement orders, which "are reviewed under the abuse of discretion standard" and "will not be disturbed absent a manifest showing of abuse." (*Sabrina H.*, *supra*, 149 Cal.App.4th at p. 1420.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. ' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641.) Rather, "[t]he reviewing court should interfere only " 'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' [Citations.]" [Citation.]' " (*Alicia B.*, *supra*, 116 Cal.App.4th at p. 863.)

Contrary to the Agency's position, we conclude Father adequately preserved his argument for appeal. The Agency acknowledges that Father's counsel argued against placing Child with the maternal relatives because she should remain in close proximity to Father but contends Father's failure to argue that distance created a barrier to reunification forfeited the reunification argument. Opposing the placement due to distance from Father sufficiently preserved the argument. Regardless, we would exercise our discretion to consider the merits of the argument even if forfeited. (*In re H.D.* (2024) 99 Cal.App.5th 814, 817–818.)

10

However, under the facts of this case, we conclude the court acted within its discretion in placing Child with the maternal relatives given, among other factors, the trauma she previously experienced, culminating in the death of Mother. This placement was recommended by both the Agency and by Child's attorney based on her wishes. As required, the court considered the section 361.3 factors, concluding that both relatives satisfied the factors to obtain preferential relative consideration. The court then reasonably concluded that certain factors weighed more strongly in favor of placement with the maternal family.

The record supports the court's conclusion that Child had a stronger and longer relationship with her maternal relatives than she had with paternal aunt Amelia, who had not seen Child for two years prior to this case, when Child was three years old. Further, Child was doing well at home and in school with the maternal family, and she feared being away from them. Despite the distance from Father, a juvenile court could reasonably conclude that it was in Child's best interest to maintain continuity and stability with the maternal relatives she knew better, especially after experiencing an unstable living situation with her parents and the loss of her mother. (See *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 ["The passage of time is a significant factor in a child's life; the longer a successful placement continues, the more important the child's need for continuity and stability becomes in the evaluation of her best interests."].)

We disagree with Father's contention that there is a statutory requirement that the placement be "as near as possible to father." Rather, the statute requires *consideration* of the ability of a relative to "[f]acilitate court-ordered reunification efforts" (§ 361.3, subd. (a)(7)(E)) and the proximity of the placement to parents for purposes of visitation and

11

reunification (Family Code, § 7950, subd. (a)(1)). Under section 361.3, subdivision (a)(1), the court must also consider "[t]he best interest of the child, including special physical, psychological, educational, medical, or emotional needs." Under Family Code section 7950, the court need not even place the child in the home of a relative if that "placement would not be in the best interest of the child." The statutory requirement that visitation occur "as frequent[ly] as possible" is likewise limited by that which is "consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) Indeed, "the fundamental duty of the juvenile court is to 'assure the best interest of the child . . . .'" (*Alicia B.*, *supra*, 116 Cal.App.4th at p. 864.)

Here, the court ordered liberal visitation for Father, including in-person visits, and the maternal family demonstrated a willingness and ability to facilitate remote and in-person visits with both Father and his family. The court ordered the Agency to coordinate the visits with Father and repeatedly emphasized the importance of ensuring they take place. Father's claim that the out-of-county placement "would frustrate or prevent [his] reunification services by restricting [his] ability to visit with the [child] . . . is speculative." (*Sabrina H.*, *supra*, 149 Cal.App.4th at p. 1422.)

*Luke L.*, *supra*, 44 Cal.App.4th 670, does not compel a different conclusion. In that case, the court concluded that placement of children with relatives in Los Angeles County hundreds of miles away from mother in Butte County "'would effectively doom visitation'" and her attempt at reunification. (*Id.* at p. 681.) Unlike here, there was no suggestion that the children in that case were already placed with the Los Angeles County relatives and would suffer additional trauma by removing them from that safe and comfortable placement. The case did not discuss the psychological and emotional needs of the children, who were the subject of the dependency.

12

Moreover, as the Third District recognized in *Luke L.*, "The court must balance the right of the parent to attempt reunification with the minor's interest in a beneficial placement . . . ." (*Luke L.*, *supra*, 44 Cal.App.4th at p. 680.) The court determined that in certain cases "the relative placement preference must give way to the pursuit of reunification." (*Ibid.*) However, it was not an abuse of discretion for the court to determine that this is not such a case. Under the circumstances of this case, the trial court reasonably found that Child's best interest in a maintaining her successful placement with her maternal relatives did not give way to the speculative argument that the out-of-county placement deprived Father of the opportunity to reunify with Child. The mere fact that the paternal aunt's home may also have been an acceptable placement does not enable us to substitute our judgment for that of the trial court when the trial court acted within its discretion.

On reply, Father raises new arguments which we address for the sake of completeness. Father argues the court failed to consider the wishes of a parent and paternal relative under section 361.3, subdivision (a)(2). In full, this subdivision of section 361.3 provides the court shall consider "[t]he wishes of the parent, the relative, and child, if appropriate." Here, the court was faced with two relatives who both wished for placement, and the court considered the wishes of both. The court heard argument as to Father's wishes, and we infer that those wishes were considered. However, Child's wishes to remain with the maternal family, among the other circumstances discussed above, also mattered. Simply because the court did not do as Father wished does not mean it did not consider his wishes.

Finally, Father raises section 361.2, subdivision (g)(1), which provides, "[i]f the child is taken from the physical custody of the child's parent . . . and unless the child is placed with relatives, the child shall be placed in foster

13

care in the county of residence of the child's parent . . . ." Because Child was placed with relatives, the requirement to place Child in foster care in the same county as parent does not apply.

DISPOSTION

We affirm the juvenile court's placement order.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

CASTILLO, J.

14