Filed 8/12/16  In re N.G. CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.G., a Person Coming Under the Juvenile Court Law. | |
| MARIA G., | F073229 |
| Plaintiff and Appellant, | (Stanislaus Super. Ct. No. 517203) |
| v. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | **OPINION** |
| Defendant and Respondent. | |

### THE COURT[*]

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

David M. Meyers for Defendant and Appellant.

John P. Doering County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]	Before Gomes, Acting P.J., Detjen, J., and Smith, J.

Appellant Maria G. is the maternal great-aunt of 21-month-old N.G., a dependent of the juvenile court.  Maria appeals from the juvenile court's orders denying her modification petitions (Welf. & Inst. Code, § 388)**1** requesting placement.  She contends the court erred in summarily denying the first petition and in misapplying section 361.3, subdivision (a), the relative placement statute, to her second petition.  She also contends the juvenile court abused its discretion in determining that it was not in N.G.'s best interest to be placed with her.  We affirm.

### PROCEDURAL AND FACTUAL SUMMARY

In January 2015, then two-month-old N.G. was removed from the custody of his teenage parents, M.M. (mother) and M.F. (father), by the Stanislaus County Community Services Agency (agency) after he sustained multiple fractures while in their care.  N.G.'s pediatrician opined that his fractures were the result of non-accidental trauma.  The juvenile court detained N.G. pursuant to a dependency petition and the agency placed him in foster care.  In March 2015, the agency placed N.G. with his maternal great-aunt Cecilia, Maria's sister.

In May 2015, mother and father waived their right to challenge the jurisdictional findings proposed by the agency and to forego reunification services with the understanding that the juvenile court would conduct a section 366.26 hearing and place N.G. in a legal guardianship with Cecilia.  Cecilia agreed that she would keep mother and father away from her home and understood that if she allowed them in her home N.G. would be removed from her care.  The court sustained allegations that N.G. suffered two separate non-accidental injuries (a spiral fracture to his left femur and a left parietal skull fracture) while in the exclusive care of his parents and that the fractures required significant force or trauma and adjudged N.G. a dependent child under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect) and (e) (severe physical

---

**1**      Statutory references are to the Welfare and Institutions Code.

abuse). The court did not determine whether mother or father caused N.G.'s injuries. The court denied the parents reunification services under section 361.5, subdivision (b)(14) (waiver of reunification services) and scheduled a section 366.26 hearing. The next day, the placement specialist made an unannounced visit to Cecilia's home and discovered that Cecilia had left N.G. in mother's care while she ran an errand. The agency removed N.G. from Cecilia's care and placed him in foster care. It also filed a motion asking the court to withdraw mother and father's waivers and to conduct a dispositional hearing. The juvenile court withdrew mother and father's consent to the guardianship, set aside the dispositional orders and scheduled a contested dispositional hearing.

In June 2015, Maria requested placement of N.G. A social worker conducted an in-home inspection but withheld approval of Maria's home pending an exemption for Ivan, Maria's fiancé, who lived in her home and had two misdemeanor convictions, one for false imprisonment in 2006 and the other for driving under the influence of alcohol in 2007.

In September 2015, the agency notified Ivan that his request for home approval was denied because his criminal background could not be cleared or exempted. Ivan filed a request for a hearing before the Department of Social Services, State Hearings Division.

In October 2015, Maria's attorney filed the first of two section 388 petitions asking the juvenile court to place N.G. in Maria's care and to order the agency to re-assess and approve Ivan's application for a criminal exemption. The juvenile court denied Maria's petition, stating it was premature because N.G. had not yet been declared a dependent child.

In November 2015, following a contested dispositional hearing, the juvenile court denied mother and father reunification services under section 361.5, subdivision (b)(5)[2] and set a section 366.26 hearing for March 2016. Mother challenged the juvenile court's setting order by extraordinary writ petition and Maria's attorney re-filed her section 388 petition asking for placement. The agency opposed Maria's petition and the juvenile court set a contested hearing for January 2016.

Meanwhile, Ivan and Maria testified before an administrative law judge who granted Ivan's claim. The administrative law judge determined that Ivan was "rehabilitated and of such good character that he should be granted a criminal record exemption" to have a child placed in his home. The administrative law judge also determined that the agency misapplied the regulation concerning criminal exemptions to Ivan and ordered it to rescind its action denying his application for home approval and find him eligible for a criminal record exemption. The judge also ordered the agency to continue the relative home process.

The agency recommended against placing N.G. with Maria and Ivan and recommended the juvenile court deny Maria's section 388 petition. The agency did not believe that Maria and Ivan would protect N.G. from mother and did not believe that Ivan had rehabilitated himself. The agency's opinion was based on social worker Nora Rice's interviews with Maria and Ivan. Maria told Rice she was a master's trained social worker and had known Ivan since high school. They had been living together since 2011 and had no children. Ivan was employed by a medical device company and said he had been in a relationship with Maria for 20 years. In fact, he had been married and divorced during that time. Ivan said they paid $2,500 a month in rent but later in the conversation

---

**2** Section 361.5, subdivision (b)(5) authorizes the juvenile court to deny a parent reunification services when it finds by clear and convincing evidence that the child was brought under the jurisdiction of the court under section 300, subdivision (e) because of the conduct of that parent.

4

said they paid $700. He explained that they told people it was $2,500 because he was renting his father's house.

Rice asked Maria and Ivan if they maintained a relationship with mother. According to Rice, they "snickered" and said they were maintaining a distant relationship with her on the advice of their attorney. Maria said she and mother spoke regularly. Maria believed mother was a "good, protective mother." She implied that father injured N.G. and gave the impression that mother was not responsible for N.G.'s injury and that mother's mistake was choosing the wrong man. Ivan said he had "no idea" what happened to N.G. but did not believe mother had done anything wrong and thought she was a good mother.

Ivan told Rice he had not visited N.G. because the court did not "require" him to and he had not been involved in the prior three months. Rice asked him whether he was ready to be a father. He responded, "I guess." Rice noted in the report that she previously arranged a visit for Ivan with N.G. and Ivan asked if he "had to go." Ivan explained that his arrest for false imprisonment stemmed from his then-wife's admission to an extramarital affair and the ensuing argument. The neighbors called the police. Meanwhile, Ivan tried to keep her from leaving by sitting on her. He completed domestic violence counseling but could not remember the name of his counselor or the name of the facility. Rice asked him to provide proof that he completed the counseling but he had not done so by the time the agency filed its report.

In January 2016, the juvenile court conducted a contested hearing on Maria's section 388 petition. The key issue was whether Maria would protect N.G. from his mother. Maria testified that mother and N.G. stayed with her during the first month or two of N.G.'s life. After that, she visited him almost every weekend at Cecelia's home until he was removed from Cecelia. She subsequently saw N.G. four times. She planned to stay home with N.G. if he was placed in her custody and would protect him from his parents by keeping a distance from them and maintaining boundaries. She said she had

5

no relationship with the father. She knew that N.G. was removed because he sustained a fracture while in his parents' care. She did not know who was at fault but respected the court's findings. She acknowledged saying mother was a "good" mother but denied saying she was "protective." She believed N.G. should have been removed from his parents and said that was her position all along. She also agreed with the agency's decision to remove N.G. from Cecelia. She believed both parents were responsible even if only one of them was found to have injured N.G. She was willing to adopt N.G.

Ivan testified about statements he made to Ms. Rice. He admitted snickering at her question but said he was reacting to the way she asked the question. When he told Rice he and Maria had been in a relationship for 20 years, he was generalizing the duration of the relationship, not trying to hide his marriage. He admitted asking if he had to go visit N.G. but explained he asked because he had to request time off of work. He understood that his question gave the impression he was not interested in N.G. He believed mother was responsible for protecting N.G. and failed. He denied stating that mother was able to protect N.G. He said he was able to protect N.G. from mother and father and was committed to Maria and to N.G. He had no relationship with the father and acknowledged mother if he saw her but did not otherwise communicate with her.

Nora Rice testified that Maria told her during their January 2016 interview that mother and N.G. stayed with her for one week after N.G.'s birth. Rice also testified that Maria's exact words to her were that mother was "a good, protective mother." Maria also said that mother had done nothing wrong. Rice believed that Maria and Ivan minimized N.G.'s injuries and would not protect him. She said the family had a "very united front" and was very close. The family did not believe that the mother had done anything wrong but "picked the wrong guy." Rice did not know if Maria had read the medical reports but knew that N.G. had a fracture and that the skull was involved. Rice could not say whether Ivan could be protective because she had had very little interaction with him. However, she was concerned about his truthfulness and thought he may have a problem

6

with alcohol. She was also concerned that he had not provided documentation verifying his completion of domestic violence counseling. She was not aware of any domestic violence incidents he was involved in during the previous five years.

Rice further testified that she did not consider N.G.'s bond to his foster family in assessing Maria's request for placement. Rice was asked what mother and father's wishes were with respect to relative placement. She said N.G. was placed with Cecelia because mother had asked to have him placed with relatives. She did not know if mother stated a preference after he was removed from Cecilia. She did not know if father was asked but read a log note in which father reportedly did not want N.G. placed with maternal relatives.

Gloria Ringsby, an emergency response manager, testified that she was involved in assessing Maria and Ivan for placement. A major concern initially was the family was not acknowledging what happened to N.G. County counsel asked her to review a confirmation letter from the County of Santa Clara showing that Ivan successfully completed a domestic violence program and asked if that changed the agency's position. She said it did not. She said N.G. had been in four different homes and was placed in a concurrent home on August 7, 2015.

Patty O'Reilly, placement specialist, assessed Maria's home on June 29, 2015. While there, Maria stated, "You know, it is really awful, the circumstances of this case, and I think the County is being horribly unfair to my niece." Maria further told O'Reilly, "You know, all that happened to the baby is he only had a fracture, and it was just like a femur or something." Maria also stated she did not think that it was a "big deal" and she knew mother did not do it. She said it was the only thing that happened and she immediately separated from the father and was doing all she could to get the baby back.

On rebuttal, Maria testified there had never been any domestic violence in her relationship with Ivan. She denied minimizing N.G.'s injuries when speaking to O'Reilly but acknowledged she did not emphasize the severity in terms of how she felt. She

7

understood the severity of his injuries. She said she was able to follow the agency's rules and protect N.G. Ivan testified he did not have a problem with alcohol. He thought mother failed to act to protect N.G. She was unwilling to accept responsibility or acknowledge that father injured N.G. He thought it possible that she could have been responsible. He said he would follow the agency's rules and could protect N.G. from his parents.

The juvenile court granted Maria's section 388 in part to find that the agency abused its discretion and should have granted Ivan's request for a criminal exemption. However, the court found it would not be in N.G.'s best interest to order a direct placement with Maria and Ivan because the court did not believe Maria could provide him a safe and secure home and protect him from his parents.

On February 2016, we granted mother's petition and ordered the juvenile court to conduct a new dispositional hearing. (*M.M. v. Superior Court* (Feb. 25, 2016, F072693) [nonpub. opn.].) We concluded there was insufficient evidence to support a finding under section 361.5, subdivision (b)(5) that mother knew or reasonably should have known that N.G. was being physically abused.

**DISCUSSION**

Maria contends the juvenile court erred in summarily denying the section 388 petition she filed in October 2015 (hereafter "the first petition"). She further contends the court erred in denying the petition she filed in November 2015 ("the second petition") because it did not consider the evidence in light of all the factors listed in section 361.3, subdivision (a), the relative placement statute. It also erred, she argues, in finding that it would not be in N.G.'s best interest to be placed with her.

Under section 388, a person having an interest in a dependent child may petition to modify a prior order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1).) At a hearing on a section 388 petition seeking to change a child's

8

placement, the moving party must show a change of circumstances or new evidence and that a change in placement is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) It is undisputed that a change in circumstances had occurred in N.G.'s placement. The issue was whether placing him with Maria was in his best interests.

We review the juvenile court's ruling on a section 388 petition for abuse of discretion. Reversal is appropriate only if we find the court has made an arbitrary, capricious or "patently absurd" determination. We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the lower court. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) We ask only whether the court abused its discretion with respect to the order it actually made. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

We begin with Maria's second petition. Section 361.3 requires that certain relatives, including those whose status is preceded by the word "great," be given "preferential consideration" for placement whenever a child is removed from parental custody under section 361. (§ 361.3, subds. (a), (c)(2) & (d).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) The relative placement preference established by section 361.3 does not constitute "a relative placement guarantee." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798; italics omitted.) Nor does section 361.3 "create an evidentiary presumption that relative placement is in a child's best interests." (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 855.) It " 'merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' " (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 376.)

In determining whether to place the child with the requesting relative, the juvenile court and social worker are to consider, among other factors and as relevant here, the best interests of the child; the parents' wishes; the good moral character of the relative and

9

any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts; the nature and duration of the relationship between the child and the relative and the relative's desire to provide legal permanency for the child; the relative's ability to provide a safe, secure and stable environment for the child, exercise proper and effective care and control of the child; provide a home and the necessities of life for the child and protect the child from his or her parents. (§ 361.3, subd. (a)(1)-(8).) Ultimately, the "linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863.)

Contrary to Maria's assertion, the juvenile court considered *all* of the factors along with the evidence. Counsel elicited testimony responsive to each factor and the court acknowledged that it had to consider the factors in deciding the matter. Ultimately, the juvenile court based its opinion on one specific factor, Maria's ability to protect N.G. from his parents. (§ 361.3, subd. (a)(7)(D).) The court decided that Maria would not protect N.G. after she gave conflicting accounts about whether she believed mother was responsible for N.G.'s injuries. The court explained:

> "[T]he thing that troubles me most is the testimony from [Maria] when she testified that she knew the fracture was sustained while [N.G.] was in the care of the parents, and, yes, she agreed [N.G.] should have been removed, but she said that that's always been her position. [¶].… But when Ms. O'Reilly testified about the statements made by [Maria] in which she minimized the injuries caused to [N.G.] and blamed it all on the [a]gency—even if one didn't know what had happened, it still is— [Maria's] testimony is still contrary to what she told Ms. O'Reilly, because she is saying that that was her position all along. And I didn't hear [Maria] explain or be rehabilitated, in any way, in her testimony as to why she would have said something so entirely different to Ms. O'Reilly than what she told the [c]ourt today."

Having decided that Maria would not protect N.G., the juvenile court found it would not be in N.G.'s best interest to be placed with her and denied her petition. The court stated:

"[T]he [c]ourt finds that it would not be in the best interests of [N.G.] to order a direct placement with [Maria and Ivan], because this [c]ourt is not convinced as to [Maria's] ability to provide a safe, secure, and safe environment for [N.G.] and to protect him from his parents based upon the testimony of Ms. O'Reilly, coupled with [Maria's] failure to explain that huge discrepancy in which she told Ms. O'Reilly back at the end of June 2015 and her testimony in court in these proceedings. So that is the [c]ourt's ruling."

To prevail on this appeal, Maria would have to show that the juvenile court's denial of her section 388 petition was an abuse of discretion. Given the court's concern for N.G.'s safety and Maria's ambivalence about mother's involvement in his injuries, we find no abuse of discretion in the court's denial of her second petition.

Nor do we find any error in the juvenile court's denial of Maria's first petition. Maria contends the court erred in summarily denying it because it allowed N.G. to remain with his foster family longer and develop a deeper bond with them. That additional time, she argues, prejudiced her in her effort to obtain custody of him. There are several fundamental problems with her argument. First, the court did not deny Maria's petition because N.G. was more bonded to his foster family. It denied her petition because it was premature. Secondly, the court had no evidence with which to weigh N.G.'s bond with his foster family and the court refused to speculate. The court stated,

"I cannot speculate that the fact that [N.G.] has been with the current care providers for a period of five and a half months would actually cause him any real detriment to be moved, at this point. And I certainly agree that there is a great deal of benefit to being raised by family, because certainly you have that sense of identity, know where you came from, and certainly, that's very important."

Finally, even if the court erred in denying Maria's first petition, there is no reason to believe given the evidence that it would have found Maria more protective and granted her petition had it considered her petition at that time.

We find no error.

11

## DISPOSITION

The orders of the juvenile court are affirmed.