Filed 7/26/22 In re E.R. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re E.R., a Person Coming Under the Juvenile Court Law. | B314487<br><br>(Los Angeles County Super. Ct. No. 21CCJP01792A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Ed.R.,<br><br>Defendant and Appellant;<br><br>CARLA R.,<br><br>Intervener and Appellant. | |
| In re J.R., a Person Coming | B314498 |

Under the Juvenile Court Law.

(Los Angeles County Super. Ct. No. 21CCJP01864A)

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,

Plaintiff and Respondent,

v.

CARLA R. et al.,

Defendants and Appellants.

APPEALS from findings and orders of the Superior Court of Los Angeles County, Jean M. Nelson, Judge. Dismissed in part and affirmed in part.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant Ed.R.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Intervener, Defendant and Appellant Carla R.

John P. McCurley, under appointment by the Court of Appeal, for Minor E.R.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Minors E.R. (born Mar. 2012) and J.R. (born Sept. 2019) share the same father, defendant and appellant Ed.R. (father). E.R.'s mother, Claudia R. (Claudia), is presumed deceased. J.R.'s mother is father's current wife, defendant and appellant Carla R. (Carla). E.R. and J.R. were each the subject of a separate juvenile dependency petition brought under Welfare and Institutions Code section 300.[1] The juvenile court consolidated the two dependency cases for all purposes.

At the August 4, 2021, adjudication hearing, the juvenile court declared E.R. and J.R. dependents of the court and removed them from father's custody. The court denied Carla's request to be deemed E.R.'s presumed parent and declined to place E.R. with her. Carla retained physical custody of J.R. under the supervision of the Los Angeles County Department of Children and Family Services (DCFS).

Father filed a notice of appeal from the jurisdictional findings and dispositional orders regarding E.R. Carla filed a notice of appeal from the order denying her request to be deemed E.R.'s presumed parent. From these, case No. B314487 ensued. Father and Carla also each filed a notice of appeal from the

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

jurisdictional findings and dispositional orders regarding J.R., and case No. B314498 ensued.

The only contention made by father and Carla in their appellate briefs is that the juvenile court abused its discretion by declining their requests for E.R. to be placed with Carla. As Carla failed to identify the juvenile court's placement order of E.R. in her notice of appeal, we dismiss her appeal pertaining to E.R. (case No. B314487). Entertaining father's appeal pertaining to E.R. on the merits, we find no abuse of the juvenile court's discretion and, therefore, affirm the jurisdictional findings and dispositional orders regarding E.R. Because father and Carla raise no arguments pertaining to J.R., we dismiss their appeals as to the jurisdictional findings and dispositional orders regarding him (case No. B314498).

## BACKGROUND[2]

*Father's Marriage to Claudia*

Father met E.R.'s mother, Claudia, on a trip to El Salvador in 2011. E.R. was born there in 2012. By 2014, father and Claudia had married, and Claudia moved with E.R. to the United States to live with father.

Father physically and emotionally abused Claudia. Claudia obtained a temporary restraining order against father in August 2014, but she subsequently requested that it be dismissed after father threatened to kill himself and take E.R. away. She obtained another temporary restraining order against father in March 2016. In a declaration filed in mid-April 2016, Claudia described father's threats to take E.R. away, father's physical and

---

[2]     Because father and Carla raise no issues related to J.R.'s dependency case in their briefs, this section only includes facts regarding J.R. that are relevant to E.R.'s dependency case.

4

verbal abuse of her, and an incident when father "became very irritable and violent, and started to hit [E.R.] in the head, with an open hand about [two] times and calling him names."

In late April 2016, father convinced Claudia to give him another chance.

*Claudia's Disappearance*

Father reported Claudia missing in May 2016. He claimed that he had last seen her three days earlier after he dropped her off to go "'clubbing.'" Claudia has not been seen since and is now presumed deceased.

*Father's Marriage to Carla*

Father met Carla around September 2016 and married her in a church ceremony in April 2017. In June 2017, father obtained a judgment of dissolution of his marriage to Claudia and, thereafter, married Carla in a civil ceremony. In 2019, father and Carla had a son, J.R.

*Father's Arrest*

In April 2021, father was arrested by federal authorities and charged with kidnapping resulting in the death of Claudia. (18 U.S.C. § 1201(a)(1).) Father remained in custody throughout the dependency proceedings.

Upon father's arrest, DCFS placed E.R. in foster care. J.R. remained in Carla's care. E.R. told a social worker that he knew that Carla was not his biological mother and that he had a good relationship with her.

The DCFS social worker spoke with Carla on the day of father's arrest. Carla claimed to not know anything about Claudia and that she had never met her. Carla nevertheless reported seeing Claudia at Carla's place of work one or two years earlier. Carla denied calling law enforcement because she was

not sure it was Claudia and did not know that Claudia was still a missing person.  Asked what father had told her about his relationship with Claudia, Carla answered, "'Just that they got divorced and if she (Claudia) really wanted to see [E.R.] then she would come[.]'"  According to Carla, E.R. did not ask "'a lot'" about Claudia.  Carla stated:  "'We just tell him she's not here and that she left to be with someone else[.]'"  Carla did not know why E.R. had never been enrolled in counseling related to Claudia's absence.

The DCFS social worker observed a forensic interview of E.R. conducted the day after father's arrest.  E.R. stated that he knew that father had been arrested but denied knowing the reason.  He knew that Carla was not his biological mother, but he stated that he did not remember his biological mother's name and did not know the last memory he had of her.  He remembered other events, however, such as details of father and Carla's wedding.  E.R. was shown several photographs of himself with Claudia and one with father.  E.R. repeatedly stated that he did not know the people in the photographs.  He fidgeted and appeared to be uncomfortable.  The social worker believed that he had "been coached" not to speak of Claudia.

*Dependency Petition*

On April 19, 2021, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over E.R. pursuant to section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), and (g) (no provision for support).  Counts a-1 and b-1 alleged that father physically abused E.R. by repeatedly striking his head.  Counts b-2 and g-1 alleged that

6

father remained incarcerated following his arrest and that he had failed to arrange for the ongoing care and supervision of E.R.[3]

*Carla's Statement Regarding Parentage*

Carla filed a statement regarding parentage on April 21, 2021, in which she requested that the juvenile court find her to be E.R.'s presumed parent. She stated that E.R. had lived with her from June 2017 to April 15, 2021; that she had participated in various activities with E.R., including assisting him with homework and making him home-cooked meals; and that she "treat[ed] [E.R.] as if he [were] [her] own biological child."

*Detention Hearing*

At the detention hearing on April 22, 2021, the juvenile court found that a prima facie showing had been made that E.R. was a person described by section 300. Carla, joined by father, requested placement of E.R. with her. The court ordered a prerelease investigation to assess Carla and reserved the presumed parent issue until the jurisdiction and disposition hearing. The court detained E.R. in shelter care under DCFS supervision.

*Prerelease Investigation*

DCFS filed its prerelease investigation regarding Carla on May 20, 2021. According to the investigation, Carla had quit her job the previous month. With no source of income other than what father had left her, she had stopped paying the mortgage on the family home and had recently applied for Cal-Works. DCFS

---

[3]     On April 22, 2021, DCFS filed a separate dependency petition on behalf of J.R. under section 300, subdivisions (a), (b)(1), and (j) (abuse of sibling). On July 9, 2021, the juvenile court consolidated for all purposes the case pertaining to J.R. with the case pertaining to E.R.

7

also reported that it had become aware of several incidents of domestic violence between father and Carla. DCFS recommended against placement of E.R. with Carla.

*First Amended Dependency Petition*

DCFS filed a first amended dependency petition on May 21, 2021, on behalf of E.R., which added a b-3 count to allege that father and Carla had a history of engaging in violent altercations in E.R.'s presence.[4]

*Arraignment*

Father entered a denial at the arraignment hearing on May 21, 2021. Father's counsel requested that E.R. be placed with Carla, and the juvenile court ordered DCFS to continue investigating placement with her. The court permitted father to write E.R. a letter but required him to first send it to the social worker to determine the propriety of giving it to E.R.

*Jurisdiction/Disposition Report*

E.R., who remained in foster care, was interviewed by a DCFS dependency investigator in mid-May 2021. E.R. denied any type of abuse by Carla. He stated that he wanted to return home to Carla, father, and J.R. When asked what he liked the most about living with Carla, E.R. replied, "'Well she's not my real mom, but I call her mom. She's my mom and I like living with her. . . .'" E.R. hesitated when he was asked if he felt safe with Carla. When asked again, he stated, "'Well, sometimes I feel safe.'" E.R. proceeded to explain that father and Carla sometimes fought, which scared him.

---

[4] DCFS also filed an amended petition on the same day on behalf of J.R., which added counts regarding domestic violence between father and Carla.

8

E.R. described witnessing four incidents of domestic violence between father and Carla. During the first incident, Carla hit father with a wooden ruler. When asked if father hit Carla, E.R. replied, "'He didn't hit her, he just shoved and pushed her a little, but he didn't really hit her.'" During the second incident, father and Carla were fighting inside the home, and Carla went outside to break father's car window with a small rock. When asked why father and Carla were arguing, E.R. stated: "'I think it's because I told my mom that my dad was married to another lady that was my real mom. My mom then said, oh really, he was.'" He further explained: "'[M]y dad told me, don't talk to your mom about your other mom. She does not like that.'" Regarding the third incident, E.R. reported that Carla tried to jump out of the car on the freeway while she and father were arguing. Finally, during the fourth incident, father pushed Carla, who fell on the couch.

When interviewed, Carla denied that she hit father with a ruler, that father shoved her, or that she tried to get out of the car.

DCFS continued to have concerns about Carla's ability to care for E.R. "due to her complete denial of the case related issues." DCFS noted that Carla had "not demonstrated any insight of the critical circumstances" in her life and had indicated that she would continue her relationship with father despite his arrest charges. According to DCFS, Carla's "denial of the case circumstances" and "denial of . . . father's violent behaviors" placed E.R. "at risk of unlimited abuse and neglect and . . . in an environment where he will continue to be alienated from his biological mother and/or the memory of his biological mother."

9

DCFS also questioned Carla's bond with E.R. Following the detention hearing, Carla had "not demonstrated an urgency to have [E.R.] released to her . . . ." E.R.'s foster parents reported that, since E.R. had been placed in their home, Carla had only initiated calls with E.R. twice. E.R. would call Carla, but a few times she did not take his calls. Carla and J.R. were receiving in-person visits with E.R. once a week for one hour. The foster parents reported that they had to continuously remind Carla not to speak to E.R. about case-related issues and, during her first in-person visit with E.R., Carla "refused to comply with monitored visits and at one point, 'walked away with the child to have a private conversation for like a minute.'"

DCFS believed "that placing [E.R.] in the home of [Carla] w[ould] place him at risk of yet another traumatic experience that may have more negative impacts in his development and mental health if there is no appropriate parent/child bond and attachment. It is in the child's best interest that he remain in his current placement to allow [Carla] the opportunity to demonstrate to the Department her commitment to the child and allow the child to explore/express[] his feelings (through counseling) about the case related issues outside the hostile environment (domestic violence) he was exposed to. Even though the Department does not ignore that the child's best interest should be in relative placement, in this case the child was living in a distorted home environment where critical circumstances ([Claudia's] disappearance, possibly murder by the father, current parental domestic violence) have occurred that continue to place the child at risk of emotional and physical harm."

DCFS assessed Carla as "clearly . . . a battered woman who continues to struggle with leaving her abusive relationship due to

10

fear, mostly to not making it on her own." DCFS strongly suspected that Carla had not been forthcoming. According to DCFS, it appeared that "father was in control of the household day to day task[s] as Carla appeared oblivious to the children's doctor's information, medical, dental and even her own legal marital status."

DCFS recommended that Carla not be found to be E.R.'s presumed parent.

*Last Minute Information for the Court (June 2, 2021)*

The DCFS dependency investigator spoke to Carla again on June 1, 2021. Carla reported that she cooked, cleaned, and cared for E.R. but that it was father "who 'usually' made the legal decisions over [him]." Carla stated: "'[Father] would usually make all the appointments for us. We would all go to the doctor and dental appointments as a family. I only took [E.R.] to the doctor's a couple of times.'" Carla continued to speak with father one to two times per week. Carla did not believe the charges against father were true and did not believe that he was a risk to E.R. or J.R. She would, however, be willing to comply with court orders and not allow father access to the children.

*Last Minute Information for the Court (July 7, 2021)*

DCFS reported that E.R.'s foster parents were providing "excellent" care of E.R. During his monitored visits with Carla and J.R., E.R. played and engaged with J.R. During various visits, Carla had letters she brought from father intercepted. Carla also needed redirection as she attempted "to engage in side conversations and discuss the case with [E.R.]." Carla had also attempted to change the location of a visit without DCFS's consent.

*Addendum Report*

Carla had completed eight virtual parenting classes. Regarding the incident when Carla tried to give E.R. a letter from father without DCFS approval, Carla stated that she had not been aware that she was not permitted to do so.

*July 9, 2021, Hearing*

On July 9, 2021, the juvenile court held a hearing on Carla's request to be deemed E.R.'s presumed parent. Carla's counsel and father's counsel argued in favor, while DCFS's counsel and E.R.'s counsel argued against.[5] The court deferred ruling on the issue until the adjudication hearing.

*Last Minute Information for the Court (Aug. 3, 2021)*

Although Carla was consistent in her visitation with E.R., the foster father reported that Carla had begun to arrive up to 20 minutes late to every visit despite being advised to arrive on time.

*Adjudication Hearing*

The adjudication hearing was held on August 4, 2021.

As for the dependency petition pertaining to E.R., the juvenile court sustained the b-2 and g-1 counts regarding father's failure to arrange for the ongoing care and supervision of E.R.[6]

---

[5] During her argument, Carla's counsel disputed that Carla had ever given E.R. a letter from father and instead contended that she had given it to the foster father.

[6] The sustained b-2 and g-1 counts state: "[E.R.] has no parent to provide care, supervision and the basic necessities of life including, but not limited to food, shelter, clothing and medical care . . . in that [E.R.'s] mother [Claudia] . . . is deceased. . . . [F]ather . . . was arrested on [April 15, 2021] for kidnapping and murder of . . . mother [Claudia], and remains

and the b-3 count regarding domestic violence between father and Carla.[7]  The court dismissed the a-1 and b-1 counts alleging father's physical abuse of E.R.

The juvenile court stated that father "seems to be able to manipulate and control [Carla] as to this case and the pending criminal case.  She seems to be acting as a conduit to . . . father and trying to help him ensure that [E.R.] is kept with family members so that he doesn't talk."  Finding Carla "not protective[,]" the court also noted that Carla denied the incidents of domestic violence between her and father and did not "seem to be alarmed by anything in" the law enforcement affidavit regarding father's alleged abuse and murder of Claudia.  The

---

incarcerated.  Further, . . . father has failed to arrange for the ongoing care and supervision of [E.R.].  Such lack of a parent endangers [E.R.'s] physical health and safety and places [him] at serious risk . . . of physical harm, damage and danger."

[7]      The sustained b-3 count states:  "[F]ather . . . and . . . [Carla] have a history of engaging in violent altercations in the presence of [E.R.].  On a prior occasion, . . . father and . . . [Carla] engaged in a violent altercation, resulting in [Carla] repeatedly striking . . . father's back with a wooden ruler, causing the ruler to break on . . . father's back.  On a prior occasion, . . . father pushed and shoved [Carla], resulting in [Carla] falling on to the couch.  On a prior occasion, . . . father and [Carla] engaged in a violent altercation, resulting in [Carla] breaking . . . father's vehicle window with a rock.  On a prior occasion . . . father and [Carla] engaged in another violent altercation while in a moving vehicle, resulting in [Carla] attempting to jump out of the moving vehicle in the presence of [E.R.].  Such violent conduct on the part of . . . father and [Carla] endangers [E.R.'s] physical and emotional health and safety and places [him] at risk of physical and emotional harm, damage and danger."

court found that Carla was not "particularly credible" and further explained that Carla "made conflicting statements over time in the criminal investigation and . . . is dismissive of this history of father's obsession with the first mother and his desire to harm her and the numerous steps he took to do that."

Following its jurisdictional findings, the juvenile court heard testimony from Carla. She testified that she visited E.R. every Saturday for one hour and denied that she had ever been 20 minutes late for a visit. She also explained that she would sometimes call E.R. but not receive a response, so she waited for him to call her almost every day. Carla testified that she had received a letter from father for E.R., which she gave to the foster father because she had been told to give anything for E.R. to him.

After allowing additional argument from counsel, the juvenile court found that there was insufficient evidence to find Carla to be E.R.'s presumed parent and therefore denied her request to be deemed as such. The court explained that Carla "was a caretaker, but she was clearly second to father as the lead parent and she didn't hold herself out openly as [E.R.'s] parent." The court found that Carla did "not have a significant relationship [with E.R.] beyond the mere fact that they all lived in a home together and some familial relationship developed." The court found the statements of E.R.'s caregivers and DCFS to be "credible as to the extent and quality of [Carla's] contact with [E.R.]" and concluded that "it [was] not the type of contact a parent has with their child if they see themselves as the parent." The court expressed concerns about Carla's motive in seeking to become E.R.'s presumed parent. The court observed: "It is extraordinary, the level of coaching that has occurred with [E.R.], to the point of he won't even say it is him in the picture with his

14

natural mother." While the court could not "say that [Carla] did that coaching," the court stated that "she certainly seem[ed] to be willing to go along with it . . . ." The court noted that there would be a loss of the relationship between E.R. and Carla, but that factor had to be "balanced" with efforts "to thwart the investigation and to get [E.R.] to forget he had a mother before," which the court found to be "extremely damaging."

The juvenile court declared E.R. a dependent of the court and removed him from father. The court concluded that it was not appropriate for E.R. to live with Carla.

In the consolidated case regarding J.R., the juvenile court sustained the counts in the dependency petition under section 300, subdivisions (b)(1) and (j), regarding domestic violence between father and Carla; dismissed counts alleging father's physical abuse of E.R.; declared J.R. a dependent of the court; and removed J.R. from father's custody. Carla retained physical custody of J.R. under DCFS supervision.

*Appeals*

Regarding E.R., Carla filed a timely notice of appeal from the August 4, 2021, "finding that [Carla] is not a presumed parent." Father filed a timely notice of appeal from the August 4, 2021, jurisdictional findings, declaration of dependency, and removal of E.R. Case No. B314487 ensued. Father and Carla also filed separate timely notices of appeal from the August 4, 2021, jurisdictional findings and dispositional orders regarding J.R., and case No. B314498 ensued. Father moved to consolidate case No. B314498 regarding J.R. with case No. B314487 regarding E.R. We granted the motion to consolidate on December 27, 2021.

15

**DISCUSSION**

I. *Appeals Regarding E.R. (Case No. B314487)*

Both father and Carla contend that the juvenile court abused its discretion by declining to place E.R. with Carla.

A. <u>Carla's appeal is dismissed</u>

DCFS, joined by E.R.,[8] argues that Carla's and father's appeals should be dismissed because their notices of appeal failed to identify the only order they challenge in their opening briefs—the juvenile court's denial of their requests to place E.R. with Carla.

"A timely notice of appeal vests jurisdiction in the Court of Appeal. [Citations.]" (*Adoption of Alexander S.* (1988) 44 Cal.3d 857, 864.) We must liberally construe a notice of appeal and find it "sufficient if it identifies the particular judgment or order being appealed." (Cal. Rules of Court, rules 8.100(a)(2), 8.405(a)(3).) "[N]otices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced." (*Luz v. Lopes* (1960) 55 Cal.2d 54, 59 (*Luz*).)

"But there are limits to our ability to liberally construe a notice of appeal. 'The policy of liberally construing a notice of appeal in favor of its sufficiency [citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or

---

[8]     We appointed appellate counsel to represent E.R. based on the recommendation of his trial counsel. (Cal. Rules of Court, rule 5.661.) E.R. filed a respondent's brief in which he joined in the combined statement of the case and facts section and the argument section of DCFS's respondent's brief. (Cal. Rules of Court, rule 8.200(a)(5).)

order not mentioned at all.' [Citations.] '[I]t is well "beyond liberal construction" to view an appeal from one order as an appeal from a "further and different order." [Citation.] "Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment being appealed." [Citation.] "The rule favoring appealability in cases of ambiguity cannot apply where there is a clear intention to appeal from only . . . one of two separate appealable judgments or orders." [Citation.] Therefore, when a notice of appeal manifests a "'clear and unmistakable'" intent to appeal only from one order, we cannot liberally construe the notice to apply to a different, omitted order. [Citations.]" (*In re J.F.* (2019) 39 Cal.App.5th 70, 76.)

Applying this law, we conclude that we lack jurisdiction over Carla's appeal regarding E.R. because her notice of appeal failed to identify the denial of her request for placement. (See *Faunce v. Cate* (2013) 222 Cal.App.4th 166, 170 ["We have no jurisdiction over an order not mentioned in the notice of appeal. [Citation.]"].) Instead, Carla's notice of appeal unambiguously stated that she appealed from the "8/4/2021 finding that [she] is not a presumed parent" and advised to "[s]ee also 7/9/21, 6/4/21, 5/26/21, 5/21/21, 4/27/21, 4/22/21[.]" It did not reference any custody order or, more specifically, the denial of the request to have E.R. placed with her. To view Carla's notice of appeal from the order denying her presumed parent status as a notice of appeal from a custody order that happened to occur at the same hearing would far exceed any reasonable liberal construction of the notice. Given that Carla does not challenge the denial of

17

presumed parent status in her opening brief, we must dismiss her appeal in case No. B314487.[9]

We come to a different conclusion, however, regarding father's appeal. On the first page of his notice of appeal, father stated that he was appealing from the following: "8/4/2021—the court sustained the b-2, b-3, and g-1 allegations." On the second page, he checked the boxes indicating that his appeal was from the declaration of dependency under section 360 "with review of section 300 jurisdictional findings" and from the "[r]emoval of custody from parent or guardian" at the August 4, 2021, hearing. By identifying the removal of custody, we find that father made it "reasonably clear" (*Luz, supra*, 55 Cal.2d at p. 59) that he was appealing from the dispositional orders regarding custody at the August 4, 2021, hearing, which encompass the order denying his request for E.R. to be placed with Carla. We therefore have jurisdiction to entertain his appeal in case No. B314487.

B. <u>The juvenile court did not abuse its discretion</u>

Turning to the merits of father's appeal, we conclude that it was well within the juvenile court's discretion to deny the request to place E.R. with Carla.[10]

1. *Applicable law*

When "a child is removed from the physical custody of his or her parents pursuant to [s]ection 361, preferential consideration shall be given to a request by a relative of the child

---

[9]    Because we dismiss Carla's appeal on this basis, we need not address DCFS's argument that Carla lacks standing to challenge custody orders relating to E.R.

[10]    Even if we were to deem Carla's notice of appeal sufficient, her arguments would fail for the same reasons as father's arguments.

for placement of the child with the relative . . . ." (§ 361.3, subd. (a).) "'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) A relative in this context includes a stepparent. (§ 361.3, subd. (c)(2).)

In assessing whether placement with a relative is appropriate, the juvenile court must consider a variety of factors, including the wishes of the parent, placement of siblings and half siblings in the same home, the nature and duration of the relationship between the child and the relative, and the ability of the relative to protect the child from his or her parents. (§ 361.3, subd. (a)(1)-(8).) "[T]he 'best interests of the child' is the linchpin of the analysis." (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1068 (*Robert L.*); accord, *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862–863 (*Alicia B.*).)

"[P]referential consideration under section 361.3 'does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' [Citation.] In other words, when a child is taken from his parents' care and requires placement outside the home, section 361.3 assures an interested relative that his or her application for placement will be considered before a stranger's request. [Citations.]" (*Alicia B.*, *supra*, 116 Cal.App.4th at p. 863.)

### 2. *Standard of review*

We review a juvenile court's placement order for abuse of discretion. (*Alicia B.*, *supra*, 116 Cal.App.4th at p. 863; *Robert L.*, *supra*, 21 Cal.App.4th at pp. 1060, 1067.) "A court abuses its discretion only when ""the trial court has exceeded the limits of

19

legal discretion by making an arbitrary, capricious, or patently absurd determination.'" [Citation.]" (*In re Caden C.* (2021) 11 Cal.5th 614, 641 (*Caden C.*).)

          3. *Analysis*

The record reflects that Carla was afforded preferential consideration for placement of E.R. Upon Carla's and father's requests at the detention hearing that E.R. be placed with Carla, the juvenile court ordered DCFS to conduct a prerelease investigation. DCFS timely conducted its investigation and filed its report. The court found it was not appropriate to place E.R. with Carla at the adjudication hearing.

This decision was well within the juvenile court's discretion given its well-founded concerns that Carla was "not protective[,]" that she was acting as a conduit for father's attempts to keep E.R. quiet, and that she was dismissive of the evidence of father's abuse of Claudia and the allegations against him regarding her disappearance. (See § 361.3, subd. (a)(7)(D) [in assessing propriety of relative placement, the court must consider the relative's ability to protect the child from his or her parents].) Furthermore, the court had made jurisdictional findings— unchallenged on appeal—that Carla had engaged in domestic violence with father in E.R.'s presence which placed E.R. at risk of physical and emotional harm. Specifically, the court found that Carla repeatedly struck father with a wooden spoon, that she broke the window of father's vehicle, and that she attempted to jump out of a moving vehicle. (See § 361.3, subd. (a)(7)(A) [the court must consider the relative's ability provide a safe and secure home for the child].) Under these circumstances, we cannot say that the court made an arbitrary, capricious, or

patently absurd determination that E.R. should not be placed with Carla.

Father nevertheless argues that other factors supported placing E.R. with Carla, including Carla's lack of a criminal record, the length of her relationship with E.R., and that it would cause E.R. to be reunited with his half brother, J.R. That may be so (see § 361.3, subd. (a)(4)-(6)), but the abuse of discretion standard prevents us from reweighing the facts and substituting our judgment for that of the juvenile court. (See *Caden C.*, *supra*, 11 Cal.5th at p. 641 ["""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""" [Citations.]"].)

Father also contends that the juvenile court's concerns about coaching E.R. and trying to make him forget Claudia were speculative. We cannot agree. The court was rightfully concerned about psychological manipulation of E.R., which was so pronounced that E.R. even denied recognizing father and himself in pictures that included Claudia. The court acknowledged that it could not say that Carla was the one who coached E.R., but it recognized that she was part of a familial dynamic that helped facilitate it. Carla admitted to telling E.R. that Claudia had left to be with someone else, and she did not know why E.R. had never been enrolled in counseling to cope with Claudia's absence.

Nor are we swayed by father's arguments that the juvenile court had a "misplaced" concern about how placing E.R. with Carla would affect father's criminal case and that the DCFS "social worker attached unwarranted significance to aspects of Carla's visitation and contact with E.R." (Bolding omitted.) Although the court noted its concern about efforts "to thwart the

21

investigation[,]" this was mentioned in the context of what would be "extremely damaging" to E.R.  The court properly maintained its focus on the best interests of E.R.  And, even if the social worker attached undue significance to certain issues, it does not mean that the court did so as well.  Father concedes as much, acknowledging that "[i]n rendering its decision, the juvenile court did not expressly rely on any of [the social worker's] complaints related to Carla's visitation and contact with E.R."

## II. *Appeals Regarding J.R. (Case No. B314498)*

Father and Carla assert no arguments challenging the jurisdictional findings and dispositional orders regarding J.R. made at the August 4, 2021, adjudication hearing.  "When an appellant's briefs fail 'to make any arguments to support any theory of error,' but there is no basis to conclude the appeal is frivolous, the appeal is deemed abandoned.  [Citation.]  'In this circumstance, dismissal of the appeal, with no consideration on the merits as to the correctness of the judgment or order from which the appeal is taken, is the proper disposition.'  [Citation.]" (*In re Mary C.* (2020) 48 Cal.App.5th 793, 809.)  Accordingly, we dismiss father's and Carla's appeals in case No. B314498 pertaining to J.R.

**DISPOSITION**

In case No. B314487, the August 4, 2021, jurisdictional findings and dispositional orders regarding E.R. are affirmed. Carla's appeal regarding E.R. in case No. B314487 is dismissed.

In case No. B314498, father's and Carla's appeals of the August 4, 2021, jurisdictional findings and dispositional orders regarding J.R. are dismissed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT