Filed 11/22/23  In re J.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | D082385 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J521176) |
| Plaintiff and Respondent, | |
| v. | |
| P.M. et al., | |
| Defendants and Appellants. | |

APPEALS from the orders of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Suzanne M. Davidson, under appointment by the Court of Appeal, for Defendant and Appellant P.M.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

P.M. (Mother) and her son, J.M., appeal from the juvenile court's findings and orders made at the Welfare and Institutions Code[1] section 361 dispositional hearing.  On appeal, Mother and J.M. argue that the juvenile court abused its discretion in placing J.M. in Arizona with the maternal aunt pursuant to section 361.3, the relative placement statute.  We disagree and affirm the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Abuse Incident Leads to Agency Referral*

In January 2023, bystanders physically detained Mother after they saw her hit her then two-year-old-son J.M. in the face multiple times.  A bystander took J.M. from Mother while other individuals called police.  Mother was intoxicated and attempting to leave when she encountered another bystander, whom she punched in the face and knocked to the ground.  Upon arriving at the scene, an emergency response worker saw an open bottle of liquor, readily accessible to J.M., next to Mother's belongings.  Emergency responders took J.M. and Mother to separate hospitals.

A doctor examined J.M., finding a swollen upper lip and a reddened cheek with linear marks.  The doctor opined that the injuries were diagnostic of physical abuse.  Upon receiving a call from law enforcement about the incident, J.M.'s maternal great-uncle attended to J.M. at the hospital and signed a caregiver affidavit.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

B.    *The Agency's Initial Investigation*

The great-uncle told the social worker that he did not get along with Mother because she acted verbally and physically aggressive toward J.M.  He already adopted J.M.'s older sister due to Mother's drug use and domestic violence.  The night prior to this incident, J.M. spent the night at the great-uncle's house.  When the great-uncle returned J.M. to Mother, J.M. clung to him, not wanting to go.  The great-uncle said he was "done with" Mother, emphasized her aggressive nature, expressed concern for J.M.'s safety while in her care, and described her as a "ticking time bomb" with "no care for [J.M.]."  The great-uncle said that Mother fails to keep J.M. clean and sells J.M.'s shoes, clothing, and toys for money to buy drugs.  Hospital staff and the emergency response worker observed J.M. to be bonded and affectionate with the great-uncle.

Mother told the social worker that, prior to the incident, she took J.M. with her to get liquor, drinking two shots of liquor once outside the store.  She explained that she suffered from schizophrenia, could not decipher her surroundings and experienced " 'blacking in and out.  I don't know what was real or what wasn't real.' "  However, she admitted she yelled and cursed at J.M. and may have accidentally hit him.  The Agency previously opened a voluntary case for Mother because she used heroin, methamphetamine, and marijuana while pregnant with J.M.  She took illicit drugs during her first trimester, but ceased use after learning of her pregnancy.  Mother reported avoiding controlled substances since 2021 but drank alcohol on and off every few months.  In addition to schizophrenia, Mother suffers from bipolar disorder.  She stopped taking psychotropic medication a few years earlier and did not participate in mental health services.

3

The social worker also spoke with J.M.'s maternal aunt (Aunt), who reported that Mother cared for J.M.'s basic needs but yelled at him due to frustration. Aunt was concerned about Mother's substance abuse and mental health. She believed Mother failed to place J.M. on an appropriate sleep schedule. Aunt observed J.M. exhibiting some of Mother's negative habits, like her short temper. Aunt and the maternal family attempted to correct those behaviors in J.M. She and the maternal family agreed the great-uncle would make the best immediate custody placement for J.M. because the great-uncle lived in San Diego. Aunt lived in Arizona but expressed her desire to provide J.M. long-term care.

C.     *The Agency's Petition and the Detention Hearing*

In early February 2023, soon after the January 2023 incident, the Agency filed a petition on J.M.'s behalf because of Mother's untreated mental health issues. Mother agreed to allow the great-uncle to care for J.M. as part of a safety plan. The Agency received a criminal protective order prohibiting contact between J.M. and Mother until 2026. The juvenile court appointed counsel for Mother and for J.M. while detaining J.M. in the great-uncle's home. To align the criminal court order with juvenile orders, the criminal court modified its protective order to allow Mother supervised visits.

D.     *The Agency's February 2023 Jurisdiction and Disposition Report*

As part of its responsibilities, the Agency prepared a jurisdiction and disposition report. It reflected Mother reported using alcohol and marijuana starting at age eight, cocaine in junior high school, and "crack" after leaving high school. Although she experienced periods of sobriety lasting up to five years, she also began using methamphetamine and heroin. She suffers from bipolar disorder and schizophrenia, was prescribed medication, but inconsistently complied with treatment. Mother recently received new

4

prescriptions and began taking her medication because of this case. In early February 2023, Mother tested negative for all substances. Mother initially expressed wanting J.M. placed with the great-uncle, Aunt, or any maternal family member.

The Agency report reflects that the great-uncle once again expressed fear for J.M.'s safety if Mother regained custody. He identified several individuals to testify against J.M.'s return to Mother's care. The great-uncle did not think Mother should ever regain custody of J.M. or that they should have any contact. When the social worker brought up visitation between Mother and J.M., he responded, " 'I will not allow that to happen' " and " 'I am going to stop that.' " The social worker informed him that he cannot make decisions regarding visitation, that all parties must abide by the court's orders, and that he should be more neutral with the court process and in his role as J.M.'s caregiver.

Aunt noted that Mother did not express gratitude to the maternal family for their care of her older children. Mother could be manipulative, mean, and loving all at the same time. As one example, Aunt recounted how Mother and J.M. stayed with her for Thanksgiving. Even though Aunt requested that while staying at her house, Mother not abuse any substances, Mother got drunk and high, yelling in the streets at 1:00 a.m. Police responded after receiving a complaint call. However, given the great-uncle's and other relatives' advancing ages, and that these people already spent time caring for Mother's children, Aunt felt it was her turn to take care of J.M.

Aunt asked the Agency to submit an Interstate Compact on Placement of Children (ICPC) assessment for her because she wanted J.M.'s long-term placement. She agreed to supervise Mother's visits, although she preferred that visits take place outside her home due to Mother's behavior at

Thanksgiving. When asked about the relationship between the great-uncle and Mother, Aunt expressed that she tries to remain neutral. She encouraged Mother to show respect to the great-uncle.

The social worker held a child and family team meeting with the maternal family members. Although the great-uncle showed a willingness to work with the Agency, he did not want to communicate with Mother by telephone. The social worker explained that caregivers generally cannot decline to communicate with a parent. The social worker noted the Agency would consider an alternate placement if the great-uncle continued to refuse engaging in the court process.

In its report the Agency recommended the juvenile court find J.M.'s petition true. It also urged the court to remove J.M. from Mother's care, place him with a relative, and bypass section 361.5 reunification services for Mother. (§ 361.5, subdivision (b)(11).)

E. *The Jurisdiction Hearing*

Mother and J.M. agreed to bifurcate jurisdiction and disposition, since the juvenile court could not order a placement assessment for Aunt until it found jurisdiction. At the March 2023 contested hearing, the court found J.M.'s petition true. It authorized the great-uncle to use the Agency as an intermediary to provide Mother with updates about J.M.

Following the Agency's request, and Mother's agreement, the court ordered Aunt's assessment to prepare for J.M.'s placement with her in Arizona. Mother also agreed with the court authorizing J.M. and the great-uncle to stay with Aunt in Arizona for a weekend.

F. *The Agency's May 2023 Report*

Between February and April 2023, Mother experienced multiple drug use relapses interspersed with negative tests for illegal substances. She

6

reported experiencing auditory and visual hallucinations. In or around April 2023, Mother moved into an inpatient treatment program.

J.M. remained placed with great-uncle and became attached to him. J.M. underwent a developmental screening because he screamed and cried at night, he struggled to share, and he hit others when he was upset. Following multiple sessions with a specialist, J.M. met his goals of decreased hitting and he learned to share with others.

J.M.'s teacher also reported improvements. When he started class in February 2023, he was afraid to interact with others, refused to participate in classroom activities, and was slightly aggressive in play. By March 2023, he interacted with everyone, exhibited confidence, was engaged, and transitioned from the great-uncle without issue.

The social worker spoke to two other maternal great-uncles. One opined that J.M. should be placed with Aunt since her home was stable, her daughter attended a top school, and this presented the only chance for J.M. to live in a secure environment. The other maternal great-uncle confirmed Aunt could provide support and care for J.M.

In March 2023, Mother participated in her first visit with J.M. J.M. requested the great-uncle several times during the visit. The great-uncle reported J.M.'s behavior regressed afterwards, with J.M. appearing more fearful and with increased crying episodes. Mother visited with J.M. two additional times in April.

In April 2023, the Agency learned that Arizona authorities approved the ICPC for J.M. to live with Aunt. The Agency asked the juvenile court for discretion to place J.M. there. Aunt was prepared for J.M. to live with her and visited him while he resided in the great-uncle's care.

G.     *The Agency's June 2023 Report*

In its June 5, 2023 addendum report, the Agency described that the great-uncle reported J.M. did well at daycare and improved in various areas. J.M. also became attached to one sister, video chatted with another sister in Arizona, and did not ask for Mother.  The great-uncle noted that he spent a significant amount of time stabilizing J.M. due to the abuse and trauma J.M. suffered in Mother's care.  The great-uncle again reported J.M. exhibited negative behaviors after visits with Mother.

The Agency also noted Aunt remained in regular contact with Mother. Aunt and Mother discussed allowing the maternal family to care for J.M. so he could enjoy stability while Mother worked on her protective issues.  If the court placed J.M. in her care, Aunt would both allow Mother to visit J.M. in Arizona and facilitate frequent Facetime visits.  Aunt also expressed willingness to travel to San Diego monthly so J.M. might visit with Mother. Aunt reported that Mother wanted custody of J.M. to receive government benefits and, invoke sympathy with the criminal court.[2]  Further, Mother expressed a preference to putting J.M. in foster care because she "does not want to work with the family."

Aunt wrote a letter to the court requesting immediate and long-term placement of J.M.  She loved and cared for J.M., video chatting with him almost daily.  Aunt already selected a preschool for J.M.; she is excited to enroll him in activities and enrichment resources.  Aunt felt ready to receive J.M. into her home.

---

[2]     The January 27, 2023 event, in which bystanders restrained mother from hitting J.M., resulted in Coronado Police Department officers responding to the scene.  Officers arrested Mother.  The Office of the San Diego County District Attorney filed a felony child abuse charge and a misdemeanor child charge against Mother.

Mother initially wanted J.M. placed with Aunt, although she implied it would be easier to reunify with J.M. if he remained in San Diego. However, if the court bypassed her reunification services Mother wanted J.M. placed with Aunt. Mother felt the great-uncle was tired and needed a break from caring for J.M., especially because he also cared for her oldest daughter.

The Agency report also reflects that the maternal grandmother reported that Mother wished to relinquish her parental rights. The amount of psychotropic medication Mother required rendered her unable to care for J.M. Mother similarly expressed concern about caring for J.M. in her current mental state, saying, " 'I don't think I can take care of him with my diagnosis, I cannot.' " When Mother reported she wanted J.M. adopted and placed in a stable home, the social worker encouraged her to speak with her attorney. Mother's attorney later sent an email to the Agency, which stated that the maternal family had been "pressuring her immensely to agree to have [J.M.] adopted by [Aunt]."

During this reporting period Mother completed four visits with J.M. Social workers observed Mother acted appropriately with J.M., and the two shared positive interactions. She also maintained her sobriety and participated in voluntary services including substance abuse and mental health treatment, parenting class, and a child abuse group. Because it seemed Mother wanted to reunify with J.M., the Agency recommended reunification services for her. The Agency's proposed case plan included Mother's participation in a child abuse group, a parenting service, and an inpatient substance abuse treatment program. It also mandated that she work with a mental health provider and comply with a psychiatric medication regimen.

Regarding an interim placement, the Agency assessed the section 361.3 factors concluding they weighed in favor of J.M.'s placement with Aunt. She was aware of J.M.'s needs, prepared her home for him, and researched schools and activities on his behalf. The maternal grandmother and the great-uncle also wanted J.M. to be placed with Aunt. Although Mother initially agreed with this approach, and did throughout most of the case, she at times implied she wanted J.M. to remain in San Diego for reunification purposes.

Regarding reunification, Aunt was willing to follow all related court orders. She was also willing to facilitate visitation between J.M. and Mother, as well as visits between J.M. and his sisters. Aunt was willing to provide J.M. with permanency if reunification efforts failed, and she found daycare providers and/or preschools for J.M.

The Agency report observed that the great-uncle expressed a willingness to provide temporary care of J.M. The maternal family believed the great-uncle grew tired of caring for Mother's children. The great-uncle hesitated to state these feelings because he did not want J.M. in foster care. Moreover, the great-uncle and Mother had a strained relationship. The Agency opined this could adversely affect reunification, which required communication between the caregiver and the parent.

H.    *The Contested Disposition Hearing*

At the June 2023 contested disposition hearing, the juvenile court received the Agency's reports into evidence without objection.

The social worker testified that the Agency would fund Mother's visits to Arizona if J.M. moved there, including her travel and accommodations. The Agency would also arrange accommodations for J.M. to visit Mother in San Diego. Mother would potentially enjoy longer visits in Arizona because

she would be there for consecutive days. That meant the visits could be scheduled for more days in the week than she enjoyed in San Diego, depending on "what the family would be available to do." Aunt expressed willingness to supervise Mother's visits with J.M. and the Agency could assess additional individuals to supervise visits. The Agency would communicate with Mother's service providers to determine her availability to visit J.M. In determining whether to expand Mother's time with J.M., the Agency would evaluate visit information from Aunt, as well as observations from Mother's providers about her progress in services.

Aunt testified about her willingness to abide by the court's visitation orders. The social worker did not believe Aunt harbored bias against Mother or would impede reunification. Aunt loved Mother, but Aunt also felt protective of J.M. However, Aunt would not accommodate visits in her house. In contrast, the great-uncle refused to supervise Mother's visits, declined to have contact with Mother, and expressed concern about reunification.

Upon learning the Agency was going to recommend reunification services, Aunt "talked to the family" to figure out how to "support" Mother. The Agency viewed Aunt as the family member who "kind of helps everything stick together." The social worker viewed Aunt as the "most neutral" family member; Aunt even agreed to support Mother throughout the process. The social worker did not believe Aunt would pressure Mother to agree to adoption.

J.M. and Mother asked the court to maintain J.M.'s placement with the great-uncle. They believed it would be better for reunification and visitation.

I.     *The Court's Ruling*

After weighing the section 361.3 factors, the juvenile court found J.M.'s best interests favored placement with Aunt. The maternal family wanted

11

J.M. to be placed with Aunt. Mother also originally wanted J.M. to be placed with Aunt, and for Aunt to adopt him.

Further, Aunt was willing to care for J.M. during reunification, and agreed to a permanent placement should reunification efforts fail. Aunt would travel to San Diego monthly to facilitate visitation between Mother and J.M. Aunt also agreed to supervise visits for them in Arizona and support video calls so Mother and J.M. could talk to each other. The court ordered the Agency to hold a child and family team meeting to create a visitation plan for Mother. J.M. would remain in San Diego until the plan got deployed.

At Mother's request, the juvenile court granted her leave to set a special hearing if issues regarding visitation arose.

DISCUSSION

The sole issue presented in Mother's and J.M.'s appeal is whether the juvenile court erred by failing to apply properly section 361.3's relative placement preference criteria. Specifically, Mother and J.M. both claim the juvenile court did not correctly weigh the section 361.3 factors otherwise the court would place J.M. with the great-uncle. We disagree.

A.  *Standard of Review*

We review the juvenile court's determination regarding placement with a relative under the abuse of discretion standard. (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863.) We " 'interfere only " 'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' " ' " (*Ibid*.; see *In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*) [noting "when a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has

12

exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]" ' "].)

B.      *General Legal Principles*

Section 361.3 identifies the factors that the court and social worker must consider to determine whether placement in a relative's home is in a child's best interests.  (§ 361.3, subd. (a)(1)-(8).)  These criteria include but are not limited to: (1) the child's best interests; (2) the wishes of the parents, the relative, and the child; (3) the moral character of the relative and any others living in that home; (4) the length and quality of the relationship between the relative and the child; and (5) the relative's ability to provide a safe, stable environment for the child.  (§ 361.3, subd. (a).)

"When considering whether to place the child with a relative, the juvenile court must apply the placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement." (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719 (*Isabella G.*).)  Relatives are to " 'be assessed and considered favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child.' " (*Ibid.*, italics omitted.)  The "linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor." (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863.)

C.      *Analysis*

Mother argues that the juvenile court "improperly weighed the factors under section 361.3, subdivision (a)."  J.M. similarly argues that "the relative placement factors weighed in favor of denying the [A]gency's request to move [J.M.] to Arizona."  Through this argument Mother and J.M. ask us to reweigh the evidence and then conclude placement with the great-uncle is the

13

proper decision. But that we cannot do on appeal. (See *Stephanie M.*, *supra*, 7 Cal.4th at p. 319 ["the Court of Appeal improperly reweighed the evidence and substituted its judgment for that of the juvenile court. Its decision cannot stand."]; *In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 ["We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence"], overruled on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.)

J.M. is also incorrect to argue that "the question of relative placement was not presently a legitimate consideration at the disposition hearing." On the contrary, the law required the juvenile court at the disposition hearing to assess J.M. for placement with Aunt. (§ 361.3, subd. (b) ["In any case in which more than one relative requests preferential consideration pursuant to this section, each relative shall be considered under the factors enumerated in subdivision (a)."]; see also *In re Isabella G.* (2016) 246 Cal.App.4th 708, 719 ["The Agency is *required* to assess those relatives seeking placement according to the factors described in section 361.3, subdivision (a) (placement factors) and must document those efforts . . . "], italics in original.) Moreover, section 361.3, subdivision (b) expressly provides that the Agency can "place a child in the home of a relative . . . pending the consideration of other relatives who have requested preferential consideration." The court did not err when it considered placing J.M. with Aunt even though the court previously placed J.M. with the great-uncle.

J.M.'s reliance on *In re Maria Q.* (2018) 28 Cal.App.5th 577 (*Maria Q.*) is misplaced. In *Maria Q.*, we considered whether section 361.3 applied to a post-permanency placement request. (*Maria Q.*, at p. 581.) Here, there was

14

no such request. Instead, Aunt asked for placement prior to the dispositional hearing. In this situation *Maria Q.* is inapposite.

The record before us supports the juvenile court's decision to place J.M. with Aunt. The court correctly found that Mother expressed "on more than one occasion" that J.M. should be placed with Aunt, including as recently as June 2023. (§ 361.3, subd. (a)(2).) Both Mother and J.M. agreed to bifurcate jurisdiction and disposition to allow time for a court ordered placement assessment for Aunt. Moreover, although Mother suggested it would be easier to reunify if J.M. lived in San Diego, she never expressed to the Agency that she did not want J.M. placed with Aunt. Indeed, Mother repeatedly expressed that J.M. should live with Aunt if the court bypassed her reunification services.

The court also correctly found Aunt wanted to care for J.M. during not only reunification, but permanently if Mother's reunification effort ended unsuccessfully. (§ 361.3, subd. (a)(2), (a)(6) & (a)(7)(H)(i).) Aunt requested J.M.'s immediate and long-term placement with her, asking the Agency to submit an assessment of her. Aunt felt ready to care for J.M. and expressed concern that other relatives, like the great-uncle, were getting older and already cared for Mother's other children. Mother similarly expressed concern that the great-uncle was tired and needed a break from caring for J.M. Additionally, Aunt took part in J.M.'s life since his birth. (§ 361.3, subd. (a)(6).) She saw J.M. several times per year before the Agency opened this case, and J.M. and Mother stayed with her during the prior Thanksgiving holiday. During this matter's pendency, Aunt visited J.M. in San Diego and spoke to him on Facetime almost every day. These facts support the court's decision.

15

But Mother and J.M. argue that the court erred in placing J.M. "in a home 350 miles away from [Mother]." They contend that J.M.'s placement in Arizona makes visitation more difficult and impedes reunification. The court, however, correctly recognized Aunt's willingness to facilitate court-ordered reunification activities in California. (§ 361.3, subd. (a)(7)(E) & (a)(7)(G).) Aunt expressed support for monthly travel with J.M. to San Diego for visits. She also stated her willingness to supervise visits in Arizona. The Agency would arrange Mother's travel to Arizona and provide accommodations. Consequently, Mother could potentially visit J.M. for more time while in Arizona than she might in San Diego. While Mother's visits to Arizona required advanced planning with her service providers and Aunt, San Diego visits also need scheduling for a variety of reasons, including currently the great-uncle would not allow spontaneous visits with J.M.

Indeed, the great-uncle refused to facilitate court-ordered reunification efforts with Mother. (§ 361.3, subd. (a)(7)(E).) He was unwilling to supervise her visits, declined to have contact with her, and expressed concern about the possibility of J.M. returning to her care. Furthermore, great-uncle stated he would not provide J.M. with a permanent home if reunification efforts failed. The court correctly found these factors weighed against placing J.M. with the great-uncle. (§ 361.3, subd. (a)(7)(H)(i))

The record further establishes that Aunt provided J.M. a safe, secure, and stable environment, including a home that continued the structure he experienced with great-uncle. (§ 361.3, subd. (a)(7)(A).) In addition, Aunt provided J.M. with the necessities of life, including a designated room and enrollment in activities and enrichment resources. (§ 361.3, subd. (a)(7)(C)) She stated a willingness to protect J.M. from Mother and tried to correct

some of the negative qualities J.M. learned from Mother, like Mother's short temper.  (§ 361.3, subd. (a)(7)(D).)

Aunt would also facilitate visitation with J.M.'s relatives, including his sisters and other family residing in Arizona.  (§ 361.3, subd. (a)(7)(F).)  Since the Agency approved Aunt's home for placement, the court could presume its safety.  (§ 361.3, subd. (a)(8)(A).)  Additionally, Aunt expressed an ability to exercise proper and effective care and control over J.M.  (§ 361.3, subd. (a)(7)(B).)  After "consider[ing] all of those factors in determining which relative placement is in [J.M.'s] best interest," the court reasonably determined it was in J.M.'s best interests to live with Aunt.

Here, the juvenile court was ideally suited to "make the hard call" as to which of two placement options served J.M.'s best interests.  (See *In re M.H.* (2018) 21 Cal.App.5th 1296, 1305.)  Substantial evidence supports the court's decision to place J.M. with Aunt.  (*Stephanie M.*, *supra*, 7 Cal.4th at p. 319 ["When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"].)  We find the court did not abuse its discretion.  (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1227 [The trial court has "broad discretion to determine what best serves a child's interests"].)

## DISPOSITION

The juvenile court's findings and orders are affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.